# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| MAI PHA VUE, on her own behalf and as trustee for the estate of CHIASHER VUE, MAI YANG YANG, HAILEE VUE, NOU VUE, CHAMEE VUE, and BENJAMIN VUE, | ) ) ) ) ) ) | |
| Plaintiffs, | ) | COMPLAINT |
| v. | ) | JURY TRIAL DEMAND |
| | ) | |
| CITY OF MINNEAPOLIS; JOHN DELMONICO, RICHARD JACKSON, TROY CARLSON, DONNELL CRAYTON, RYAN DAVIS, MATTHEW GOTTSCH, BENJAMIN HAIN, DANIEL LEDMAN, RACHAEL LYNCH, PENG MOUA, DANIELLE PHERNETTON, KYLE POND, ANDREW REED, TRAVIS WILLIAMS, JASON WOLFF, AARON WOMBLE, and TOUA YANG, in their individual and official capacities, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

## COMPLAINT

COME NOW the Plaintiffs Mai Pha Vue, on her own behalf and as trustee for the estate of Chiasher Vue, Mai Yang Yang, Hailee Vue, Nou Vue, Chamee Vue, and Benjamin Vue, by and through the undersigned counsel, and for their causes of action, respectfully state the following:

# I.     PARTIES

**Plaintiffs**

1.     Plaintiff Chiasher Vue ("Chiasher") was a resident of Hennepin County and State of Minnesota. At all times material to this Complaint, Chiasher was a private citizen of the State of Minnesota, United States of America.

2.     Chiasher Vue died on December 15, 2019. He is survived by next of kin including his spouse, Mai Pha Vue, and seven (7) children.

3.     Plaintiff Mai Pha Vue ("Mai Vue") is a resident of Hennepin County and the State of Minnesota. At all times material to this Complaint, Mai Vue was a private citizen of the State of Minnesota, United States of America. Mai Vue is Chiasher Vue's spouse.

4.     Plaintiff Mai Yang Yang ("Mai Yang") is a resident of Hennepin County and the State of Minnesota. At all times material to this Complaint, Mai Yang was a private citizen of the State of Minnesota, United States of America. Mai Yang is Chiasher Vue's mother.

5.     Plaintiff Hailee Vue ("Hailee") is a resident of Hennepin County and the State of Minnesota. At all times material to this Complaint, Hailee was a private citizen of the State of Minnesota, United States of America. Hailee is Chiasher Vue's son.

6.      Plaintiff Nou Vue ("Nou") is a resident of Hennepin County the State of Minnesota. At all times material to this Complaint, Nou was a private citizen of the State of Minnesota, United States of America.  Nous is Chiasher Vue's son.

7.     Plaintiff Chamee Vue ("Chamee") is a resident of Hennepin County and the State of Minnesota. At all times material to this Complaint, Chamee was a private citizen of the State of Minnesota, United States of America.  Chamee is Chiasher Vue's daughter.

8.    Plaintiff Benjamin Vue ("Benjamin") is a resident of Hennepin County and the State of Minnesota. At all times material to this Complaint, Benjamin was a private citizen of the State of Minnesota, United States of America. Plaintiff was a minor at the time of these events. Benjamin is Chiasher Vue's son. Plaintiff Benjamin was a minor at the time of the incident. On December 15, 2019, Benjamin was seventeen (17) years old.

9.    Plaintiffs are ethnic Hmong. Chiasher and Mai Pha Vue became refugees as a result of the Vietnam war. Many Hmong cooperated with the United States government and its CIA in northern Laos during the Vietnam war. After the war, there was an aggressive campaign by the Pathet Lao to capture or kill Hmong soldiers and families who aided the CIA.

10.   Chiasher and Mai Pha Vue, along with their son Xue and Mai Yang, fled Laos as refugees in 1980 to Thailand where they lived in a refugee camp for eight (8) years. They were relocated to Minneapolis, Minnesota in 1988. Approximately 90% of Hmong refugees in Thailand were ultimately resettled in the United States. The Minneapolis-St. Paul area has the largest urban Hmong population in the world.

11.   As war refugees, many Hmong, including Chiasher Vue, experienced repeated and substantial traumatic events during and after the war.

**Defendants**

12.   Defendant City of Minneapolis ("City") is and was at all times material hereto a duly constituted governmental entity in the State of Minnesota and is, or was, the employer of all individually named Minneapolis Police Department Defendants.

13.   The Minneapolis Police Department ("MPD") is and was at all times material hereto a Minneapolis agency, providing the City's policing functions. Chief Medaria Arradondo was

the Chief of the MPD at all times material hereto and responsible for the supervision, training, and oversight of the MPD.

14.      Plaintiffs are informed, believe, and thereupon allege that Defendant Richard Jackson ("Defendant Jackson") was at all times material herein acting under color of law within the course and scope of his employment and office as a Lieutenant and law enforcement officer of the MPD. He is being sued individually and in his official capacity.

15.      Plaintiffs are informed, believe, and thereupon allege that Defendant John Delmonico ("Defendant Delmonico") was at all times material herein acting under color of law within the course and scope of his employment and office as a Lieutenant and law enforcement officer of the MPD. He is being sued individually and in his official capacity.

16.      Plaintiffs are informed, believe, and thereupon allege that Defendant Troy Carlson ("Defendant Carlson") was at all times material herein acting under color of law within the course and scope of his employment and office as a Sergeant and law enforcement officer of the MPD. He is being sued individually and in his official capacity.

17.      Plaintiffs are informed, believe, and thereupon allege that Defendant Donnell Crayton ("Defendant Crayton") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in his official capacity.

18.      Plaintiffs are informed, believe, and thereupon allege that Defendant Ryan Davis ("Defendant Davis") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in his official capacity.

19.     Plaintiffs are informed, believe, and thereupon allege that Defendant Matthew Gottsch ("Defendant Gottsch") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in his official capacity

20.     Plaintiffs are informed, believe, and thereupon allege that Defendant Benjamin Hain ("Defendant Hain") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in his official capacity.

21.     Plaintiffs are informed, believe, and thereupon allege that Defendant Daniel Ledman ("Defendant") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in his official capacity.

22.      Plaintiffs are informed, believe, and thereupon allege that Defendant Rachael Lynch ("Defendant Lynch") was at all times material herein acting under color of law within the course and scope of her employment and office as a law enforcement officer of the MPD. She is being sued individually and in her official capacity.

23.      Plaintiffs are informed, believe, and thereupon allege that Defendant Peng Moua ("Defendant Moua") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

24.     Plaintiffs are informed, believe, and thereupon allege that Defendant Danielle Phernetton ("Defendant Phernetton") was at all times material herein acting under color of law within

the course and scope of her employment and office as a law enforcement officer of the MPD. She is being sued individually and in her official capacity.

25.     Plaintiffs are informed, believe, and thereupon allege that Defendant Kyle Pond ("Defendant Pond") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

26.     Plaintiffs are informed, believe, and thereupon allege that Defendant Andrew Reed ("Defendant Reed") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

27.     Plaintiffs are informed, believe, and thereupon allege that Defendant Travis Williams ("Defendant Williams") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

28.     Plaintiffs are informed, believe, and thereupon allege that Defendant Jason Wolff ("Defendant Wolff") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

29.     Plaintiffs are informed, believe, and thereupon allege that Defendant Aaron Womble ("Defendant Womble") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

30.     Plaintiffs are informed, believe, and thereupon allege that Defendant Toua Yang ("Defendant Yang") was at all times material herein acting under color of law within the course and scope of his employment and office as a law enforcement officer of the MPD. He is being sued individually and in her official capacity.

31.     All of the facts, acts, omissions, events, and circumstances herein mentioned and described occurred in the City of Minneapolis, State of Minnesota, and the entity Defendants, and each of them, are residents of the City of Minneapolis, State of Minnesota, and/or have their principal place of business in said City and State, and/or are doing business in said City and State.

32.     Plaintiffs are informed, believe, and thereupon allege that all Defendants employed by the Defendant City were, at all times relevant and material to this Complaint, acting within the course and scope of their employment duties for Defendant City and under color of law. Plaintiffs are informed, believe, and thereupon allege that each of the individual Defendant's acts were known to, discovered by, approved by, and/or ratified by Defendant City, by and through their policy makers, decision makers, officials, officers, and/or supervisors, including named Defendants.

33.     Plaintiffs are informed, believe, and thereupon allege that officials, supervisors, policy makers, and other individuals with the authority to set or modify municipal and/or departmental policy, *de jure* or *de facto*, of Defendant City, participated in, approved of, ratified, and/or failed to prevent the acts by all Defendants of which Plaintiffs complain herein.

34.     Plaintiffs are informed, believe, and thereupon allege that at all times herein mentioned, each of the Defendants—including officials, supervisors, watch commanders, and other

policy makers from Defendant City and their agents—was the agent, employee, or co-conspirator of one other, some, or all of their Co-Defendants. Plaintiffs are informed, believe, and thereupon allege that each of the Defendants, acting individually and/or in concert with each other, engaged in a common plan to wrongfully deprive Plaintiffs of their respective rights to security in person, freedom from unreasonable searches and seizures, and due process of law, among others described herein. In doing each and all of the things herein mentioned, or neglecting or intentionally failing to rectify said misconduct, each and all Defendants were acting pursuant to a *de facto* policy and within the scope of such agency, employment, and conspiracy and with full permission, knowledge, approval, ratification, and support of each other.

35. Defendant City of Minneapolis is directly and vicariously liable for the actions and inactions of the MPD officers as alleged herein.

36. Defendants engaged in a joint enterprise and are jointly and severally liable for the actions alleged herein.

## II. JURISDICTION AND VENUE

37. Plaintiffs bring this case pursuant to 42 U.S.C. §§ 1983 and 1988 and Minnesota state law.

38. This Court has original jurisdiction over this action and the parties pursuant to 28 U.S.C. § 1331 and 1343 and the U.S. Constitution.

39. This Court has supplemental jurisdiction pursuant to 29 U.S.C. §1367 for all state claims.

40. State law claims arise from a common nucleus of operative facts with the violations of 42 U.S.C § 1983 as set forth herein.

41.     Plaintiffs have duly complied with the notice requirements of Minnesota Statute § 466.05 and the time to respond to the notice has expired without the claim having been honored.

42.     All other conditions precedent to this lawsuit have been satisfied or waived.

43.     Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(1) because one or more Defendants are situated within this venue, and under 28 U.S.C. § 1391(b)(2) because all or substantial part of the wrongful acts complained of occurred within this venue and within the District of Minnesota.

### III.     FACTUAL ALLEGATIONS

44.     All events alleged herein occurred in Hennepin County, Minnesota.

45.     The events alleged herein arose out of the MPD officer-involved shooting of Chiasher Vue on December 15, 2019. He was the husband to Plaintiff Mai Pha Vue, son to Plaintiff Mai Yang Yang, and father to Plaintiffs Hailee Vue, Nou Vue, Chamee Vue, and Benjamin Vue, as well as father to Xue Vue, Pang Nhia Vue Diaz, and Peter Yeeleng Vue.

46.     Chiasher Vue died as a result of the multiple gunshots he sustained from various MPD personnel on December 15, 2019.

47.     On December 15, 2019, at approximately 3:07 am,[1] Benjamin Vue called 911 for assistance because his father, Chiasher Vue, had discharged his firearm in the family home.

48.     A few minutes later, at approximately 3:10 am, MPD police units were dispatched to the Vue family home located at 3114 Thomas Avenue North, Minneapolis, Minnesota 55411.

---

[1] There are numerous inconsistencies with time stamps between the Computer Aided Dispatch ("CAD") records, radio dispatch, squad video, body worn camera, interview room videos, and investigative documents. Accordingly, references to times contained in this Complaint are estimations to the best of Plaintiffs' belief and the actual time of occurrence and/or length of time in between incidents may be different. To the extent available and/or when there were inconsistencies, Plaintiffs used the CAD to identify applicable times.

49.    At the time he placed the 911 call, Benjamin was in a vehicle with his two older

brothers, Hailee and Nou Vue.

50.    During the 911 call, Benjamin, Hailee, and Nou Vue located their sister, Chamee Vue

and the four Plaintiffs went to the location that the 911 dispatcher directed them to, in order

to meet up with responding MPD officers at the cross section of Thomas and Lowry.

51.    The four Plaintiffs arrived at the MPD officers' location at approximately 3:12 am.

52.    Upon information and belief, at approximately 3:12 am, Defendants Pond and Womble

placed Plaintiffs Chamee and Benjamin Vue in the back seat of patrol vehicle #425 ("Patrol

Vehicle 1"), which was locked and unable to be opened from the back seat.

53.    Upon information and belief, at approximately 3:12 am, Defendants Ledman and Wolff

placed Plaintiffs Hailee and Nou Vue in the back seat of patrol vehicle #421 ("Patrol Vehicle

2"), which was locked and unable to be opened from the back seat.

**Shooting of Chiasher Vue**

54.    At approximately 3:18 am, Defendant Carlson, on scene supervisor, initiated "Operation

100" in accordance with MPD policies and procedures.

55.    Operation 100 "is a SWAT callout where on or off-duty SWAT Tactical, Negotiators,

and Tech Team members respond to a hostile event, such as an active shooter or a barricaded

suspect, which exceeds the capabilities of traditional law enforcement first responders and

investigators."  Moreover, the "goal of negotiations is to achieve a peaceful resolution

through effective negotiation techniques when possible and to support tactical strategies."

56.    MPD Policy Number 7-801 Procedures for Operation 100 provide: "The primary

responsibility in all tactical situations is to prevent the loss of human life and to contain the

threat. Wherever possible, efforts will be directed towards peaceful resolution."

57.     Although Defendant Carlson was unclear about the procedures, he called Defendant

Jackson to initiate the request. Shortly after that call, Defendant Jackson requested a

negotiator to respond "Code 3" and informed Defendant Carlson that a negotiator was on her

way.

58.     MDP negotiator Sergeant Dubuc was dispatched and on her way to the scene. She arrived

at or around 3:45 am.

59.     At all times after the 911 call was initially made at or around 3:07 am and until the MPD

discharged their weapons at or around 3:47 am, there were no shots discharged or threatened

to be discharged by Chiasher Vue. It was not an active shooter situation because gunfire was

not present at the time of the MPD's arrival at the scene.

60.     Instead of awaiting the arrival of the trained negotiator who was on her way and despite

the absence of an "active shooter" scenario, Defendant Carlson ordered Peng Moua to engage

with Chiasher Vue.

61.     The only qualification for selecting Peng Moua was based on his ability to speak Hmong,

the same language as Chiasher Vue.

62.     At the time of this incident, Peng Moua had been a patrol officer for five (5) years and

did not have any specialized critical incident training, expertise, or qualifications as a SWAT

negotiator.

63.      Plaintiff Chamee notified Defendant Carlson that a third-party needed to speak to her

father and that he would respond better to a third-party. She expected that third-party to be a

qualified negotiator.

64.     Plaintiffs Chamee, Hailee, and Nou notified various MPD officers that their father

suffered from mental illness and depression.

11

65.    Defendant Moua asked Plaintiff Chamee to call her father on her cell phone multiple

       times. Defendant Moua asked Plaintiff Chamee to speak to her father and to get him to come

       outside.

66.    Plaintiff Chamee was able to reach her father on the phone but the connection was poor

       and it was difficult to communicate with Chiasher Vue. Defendant Moua spoke to Chiasher

       Vue and represented that he would help Chiasher.

67.    Chiasher Vue made it clear that he wanted to only speak to Defendant Moua and that he

       would come out to speak to him.

68.    Defendant Moua reassured Chiasher that it would be just him and Defendant Moua

       talking.

69.    Based on the promises and requests of Defendant Moua encouraging Chiasher Vue to

       come outside to speak to him, Chiasher came to the front porch door at or around 3:44 am.

70.    Defendant Peng Moua was not in front of the house when Chiasher exited.

71.    Plaintiff Chamee never disconnected her phone with her father.

72.    Instead of seeing Peng Moua, Chiasher Vue likely saw and heard nearly a dozen police

       officers shouting multiple directions at him in English, running towards him, and pointing

       firearms at him.

73.    There was no information provided to any of the MPD officers surrounding the house

       that Defendant Moua was the primary point of contact or that he was negotiating with

       Chiasher Vue to come outside.

74.    At or around 3:45 am, Chiasher Vue went back into his home.

75.    Defendant Moua ran back towards Plaintiff Chamee, who was already speaking to her

       father on the phone.

76.     At or around 3:47 am, Chiasher Vue came back to the front porch door, reportedly with his licensed firearm. An unidentified MPD officer yelled "He's got a gun! He's got a rifle." Next, approximately 62 rounds were fired at Chiasher Vue.

77.     According to the Bureau of Criminal Apprehension's ("BCA's") report, approximately seven MPD officers discharged their firearms: Defendants Crayton, Ledman, Womble, Yang, Carlson, Pond, and Wolff and Defendant Reed discharged his less lethal rifle.

78.     According to the BCA's report, Chiasher Vue discharged his weapon while on the front porch approximately six (6) times.

79.     There is not a single body worn camera or other recording that adequately depicts the events, including the sequence of events, or as to who shot first, that morning of December 15, 2019.

80.     Chiasher Vue arrived at North Memorial Health Hospital Emergency Room via ambulance on December 15, 2019, at approximately the 3:57 am.

81.     Chiasher Vue's vital signs were checked at 3:58 am and he had no pulse and no respirations.

82.     Chiasher Vue's time of death was called at 4:05 am, and communicated over the MPD radio dispatch shortly thereafter.

83.     Upon information and belief, there were over 100 bullets discharged at and towards Chiasher Vue and his home on December 15, 2019.

84.     According to the County Medical Examiner's autopsy report, Chiasher Vue sustained 13 bullet wounds, eight (8) of the bullets entered the posterior of his body.

85.     Immediately after the shooting, Defendant Carlson directed his officers to not let the family members out of the patrol vehicles.

86.     Plaintiff Mai Yang Yang is 70 years old, wheelchair-bound, and was inside the house
during the entire incident.

87.     Plaintiff Yang was on the first floor of the residence.

88.     After the shooting, Plaintiff Yang was taken to the hospital for injuries to her arm and
chest pain.

**Patrol Vehicle 1-Chamee and Benjamin Vue**

89.     Plaintffs Chamee and Benjamin Vue were locked in the back seat of Patrol Vehicle 1 at
approximately 3:12 am.

90.     While placed and locked in the back of Patrol Vehicle 1, Chamee Vue was asked by
MPD officers, including Peng Moua and Defendant Carlson, on numerous occasions to assist
MPD and to call her father on the phone.

91.     While placed and locked in the back of Patrol Vehicle 1, Chamee Vue attempted to open
the door but was unable to because it was locked from the outside.

92.     At one point, Plaintiff Chamee Vue exited the back seat and stood up and Defendant
Carlson told her she needed to get back into the back seat and needed to stay there because
people would need to talk to her.

93.     While placed and locked in the back of Patrol Vehicle 1, Plaintiffs Chamee and Benjamin
Vue could see and/or hear the shooting of their father in real time, hear over the phone and/or
over the Patrol Vehicle 1 radio transmissions.

94.     In addition, because of MPD's requests for Plaintiff Chamee to contact her father,
Plaintiff Chamee's phone was still actively connected to her father's cell phone at the time of
the shooting.

14

95.     Shortly after the shooting, Plaintiff Chamee Vue was taken out of Patrol Vehicle 1 and

placed into Squad #461, Patrol Vehicle 4, from which she could not exit.

**Patrol Vehicle 4-Chamee Vue**

96.     While locked in the back of Patrol Vehicle 4, Plaintiff Chamee could hear the radio

transmissions regarding her father, grandmother, and mother. She can be heard on the dash

camera weeping and pleading "Please be ok, please be ok."

97.     While Plaintiff Chamee Vue was locked in the back set of Patrol Vehicle 4, Defendant

Davis was sitting in the front of the vehicle. Plaintiff Chamee told Defendant Davis that she

saw everything and heard everything because she was on the phone with her father.

98.     A few minutes later, Defendant Davis stated that he was going to speak to a supervisor to

see if he could get her "down to 108" (e.g. MPD headquarters).

99.     Defendant Davis can be seen on the dash camera exiting the vehicle and speaking to

another unidentified MPD officer.

100.         At approximately 4:18 am, Defendant Davis came back to Patrol Vehicle 4 and

informed Plaintiff Chamee that she was being taken to city hall. Plaintiff Chamee did not

respond.

101.    Defendant Davis drove away from the scene and drove Plaintiff Chamee to MPD

headquarters.

102.    While Defendant Davis was driving to MPD headquarters, Plaintiff Chamee asked him

whether they were ever going to get an update on her father. Defendant Davis responded that

he did not know. Upon information and belief, Defendant Davis knew that Chiasher Vue had

already been pronounced dead but intentionally withheld that information from Plaintiff

Chamee.

**Patrol Vehicle 1-Benjamin Vue**

103.    When Plaintiff Chamee was taken to Patrol Vehicle 4, upon information and belief, Plaintiff Benjamin Vue remained detained in the back seat of Patrol Vehicle 1.

104.    Plaintiff Benjamin Vue remained locked in Patrol Vehicle 1.

105.    At or around 5:03 am, after his siblings had already been taken to MPD headquarters, and nearly two hours since he was initially locked in the back of Patrol Vehicle 1, Plaintiff Benjamin Vue called 911 on his cell phone for assistance and to be let out of Patrol Vehicle 1.

106.    MPD officers had forgotten about Plaintiff Benjamin, locked in the back seat of Patrol Vehicle 1. Defendants failed to provide Plaintiffs and undersigned counsel with a copy of the squad video for Patrol Vehicle 1 or #425 or the 911 call that Benjamin made to inform them that he had been left in the back of locked Patrol Vehicle 1.

107.    Defendant Hain found Plaintiff Benjamin and left him locked in the back of Patrol Vehicle 1.  He was eventually taken to MPD headquarters by Defendant Hain.

**Patrol Vehicle 2-Hailee and Nou Vue**

108.    Plaintiffs Hailee and Nou Vue were locked in the back seat of Patrol Vehicle 2 at approximately 3:12 am.

109.    At approximately 3:31 am, according to the dash cam video, Plaintiff Nou Vue requested again to be released from the car.

110.    Plaintiff Nou asked again to go outside of the patrol vehicle to try and help his father as they requested. An unidentified MPD officer, or upon information and belief Defendant Ledman or Defendant Wolff, responded "no; not yet."

111.    Plaintiff Nou Vue requested to be released from the squad car and told the officer outside
        of his squad car that they had "no right" to hold him in the car. He made this statement
        several times.

112.    An unidentified MPD officer, or upon information and belief Defendant Ledman or
        Defendant Wolff, asked Plaintiffs Nou and Hailee if they could call into the house and help
        them to get their father to come out of the house. Plaintiff Nou stated that his father is not a
        terrorist; that he is just mentally ill or depressed.

113.    Plaintiff Nou asked what law was allowing them to hold them in the squad car. Nobody
        responded.

114.    Plaintiff Nou asked to be let out of the vehicle to help talk to his father several more
        times. Plaintiff Nou repeated that his father is mentally ill and he was asked by an
        unidentified MPD officer, or upon information and belief Defendants Ledman or Wolff,
        what his father's diagnosis was and Plaintiff Nou responded, depression.

115.    Plaintiff Nou asked an unidentified MPD officer, or upon information and belief
        Defendants Ledman or Wolff, again to allow him and his sister to go talk to his father.

116.    An unidentified MPD officer, or upon information and belief Defendant Ledman or
        Wolff, responded, "You're not getting out of the squad. Stop asking." Plaintiff Nou stated
        that he could not be held in the vehicle and the same officer responded, "I can, I will and I
        am." Plaintiff Nou responded "They can't do that. They can't hold me in here."

117.    Plaintiff Nou again unsuccessfully attempted to open the door to Patrol Vehicle 2. He
        screamed multiple additional times to be let out of Patrol Vehicle 2.

118.    Plaintiffs Nou and Hailee, while locked in the back of Patrol Vehicle 2, heard all of the
        radio traffic regarding their father, including an officer's request "to launch" against Chiasher

Vue if he came back outside and did not cooperate. Plaintiff Nou screamed "No, do not fucking launch."

119.    Plaintiffs Nou and Hailee, while locked in the back of the Patrol Vehicle 2, heard the radio transmission of multiple rounds of gunfire. Plaintiff Nou screamed again "Let me out!" and screamed "Dad!"

120.    Plaintiffs Nou and Hailee were screaming to be let out of Patrol Vehicle 2, while weeping for their father who had just been shot and killed after a barrage of bullets. Meanwhile, Plaintiffs Nou and Hailee continued to hear the radio dispatch of the events and extraction of their father with a canine.

121.    Still at 3:50 am, 20 minutes since the first request, Plaintiff Nou continued to scream to be let of the vehicle multiple times for several more minutes.

122.    At approximately 3:52 am, unidentified MPD officers carried Chiasher Vue's lifeless body directly in front of the patrol vehicle in which they were locked and screaming to be released. Plaintiffs Nou and Hailee screamed for their father and to be let out of the patrol vehicle.

123.    Plaintiffs Nou and Hailee were screaming to be let of the car and an unidentified officer backed the squad car up in reverse several yards while Chiasher Vue's body, being loaded into the ambulance, remained in full view directly in front of Plaintiffs Nou and Hailee as they continued to scream for their father and to be let out of the patrol vehicle.

124.    At 3:54, Plaintiffs Nou and Hailee were continuing to scream and weep and hitting the interior of the patrol vehicle car to be released.

125.    Plaintiffs Hailee and Nou repeated to be let out of the vehicle at least a dozen more times.

126.    Plaintiffs Hailee and Nou, still locked in the patrol vehicle, heard the radio transmissions that the Plaintiffs' 70 year-old grandmother was in distress and needed an ambulance. Plaintiffs Hailee and Nou asked to be released to go to their grandmother.

127.    Plaintiffs Hailee and Nou, while locked in the patrol vehicle, heard the radio transmission that there were four family members in the squad cars "that essentially witnessed this." And Plaintiff Nou screamed, "we are not witnesses!"

128.    Plaintiffs Hailee and Nou, while locked in the patrol vehicle, heard the radio transmission that transport was needed get the family members "transported right away to get them out of the scene."

129.    Plaintiffs Hailee and Nou continued to scream to be let out.

130.    Plaintiffs Hailee and Nou, while locked in the patrol vehicle, heard the radio transmission calling for officers to respond to the patrol vehicles where the family members were detained to transport them to another location.

131.    At 3:59 am, an unidentified MPD officer opened the rear driver's side door and both Plaintiffs Nou and Haillee exited or attempted to exit the patrol vehicle.

132.    An unidentified MPD officer forced Plaintiff Nou back into the back seat of Patrol Vehicle 2. Plaintiff Nou protested and said there was no law to hold him and he screamed "you can't stop me," "what is the rule?"

133.    Plaintiff Nou was forced against his will back into Patrol Vehicle 2's back seat, from which he could not exit and Plaintiff Hailee was forced into a different patrol vehicle Squad #513—Patrol Vehicle 3, from which he could not exit.

**Patrol Vehicle 3-Hailee Vue**

134.    While locked in the back of Patrol Vehicle 3 and after the shooting of his father, Plaintiff

Hailee asked an unidentified MPD officer, or upon information and belief Defendant Hain,

"Can I please go?" and MPD officer or Defendant Hain responded, "No, not yet."

135.    A few minutes later, Defendant Lynch came to Patrol Vehicle 3 and asked "What's up?"

Plaintiff Hailee asked to go back with his brother and Defendant Lynch responded, "No, you

have to be split up right now because this is a critical incident….I understand that this is a

scary situation for you but right now you have to stay separated from your brother and I am

sorry for that." Plaintiff Hailee responded, "You either let my brother come in here or you let

me out right now or I file a lawsuit against all you guys." Defendant Lynch responded, "Ok,

that's your right." And she continued to deny to let him out and shut the door on Plaintiff

Hailee. He could not exit Patrol Vehicle 3.

136.    Another few minutes, Plaintiff Hailee again pleaded, "let me out!" to which Defendant

Lynch responded, "I cannot let you out right now, sir."

137.    A few minutes later, an unidentified person entered Patrol Vehicle 3 and moved the

vehicle a few yards away but did not respond to Plaintiff Hailee's pleas to be let out of the

patrol vehicle.

138.    While locked in the back of Patrol Vehicle 3 and alone, Plaintiff Hailee screamed, "Let

me go to the hospital with my dad!" Several minutes later, Plaintiff Hailee made the same

plea to be let out to go to the hospital with his father.

139.    Shortly after that, an unidentified MPD officers, or upon information and belief,

Defendants Phernetton entered Patrol Vehicle 3. Plaintiff Hailee asked, "How's my dad?"

and Defendant Phernetton did not respond, even though she knew that Chiasher Vue had passed away several minutes earlier.

140.    Plaintiff Hailee pleaded, "If you are going to arrest me, arrest me; if not, let me go or take me to my house."

141.    Shortly thereafter, unidentified MPD officers, or upon information and belief, Defendants Gottsch and Phernetton entered Patrol Vehicle 3 and Plaintiff Hailee asked again, "How's my dad?" Defendant Gottsch ignored his question and responded, "Yup, we gotta take you down to City Hall because they're gonna want to interview you." Patrol Vehicle 3 began to drive away. Plaintiff Hailee asked where his brothers and sisters were and whether they were also down at City Hall, but he did not receive a response.

142.    While driving Plaintiff Hailee to MPD headquarters, Defendant Gottsch said to Plaintiff Hailee, "We don't know anything that happened here. All we were told is that we needed to bring you down to City Hall so that the investigators can talk to you." When Plaintiff Hailee asked about his brothers and sisters again, Defendants Gottsch and Phernetton claimed that they did not know anything. Defendant Gottsch said to Plaintiff, "The reason why they might all be split up is because they don't want the statements to be tainted."

143.    Plaintiff Hailee requested to have the heat turned on as he was very cold.

144.    After arrival at MPD headquarters and while still locked in the back of Patrol Vehicle 3, Plaintiff Hailee again asked if there was any news about his dad and nobody responded.

145.    Off-camera, Defendant Phernetton removed Plaintiff Hailee from the back seat of Patrol Vehicle 3 and searched him. They asked him for identification, and he said it was in his wallet. Defendant Gottsch and Phernetton said "we will just hold onto it for you."

**Patrol Vehicle 2-Nou Vue**

146.    While locked in the back of Patrol Vehicle 2 and after the shooting of his father, at
approximately 4:02 am, Plaintiff Nou asked an unidentified MPD officer standing outside the
patrol vehicle, "Can I get out?" The unidentified MPD officer stated, "Not at the moment.
Someone will cover over and talk to you in a sec, cool?" Plaintiff Nou asked, "Why is that?"
"Why?" The unidentified MPD officer stated, "We will talk to you in a sec, we are still
trying to figure stuff out." Plaintiff Nou stated, "I just want to go outside."

147.    At approximately 4:07, an unidentified MPD officer entered the front passenger side of
Patrol Vehicle 2, where Plaintiff Nou was being detained.

148.    At approximately, 4:08, Plaintiff Nou asked a female MPD officer, or upon information
and belief Defendant Lynch, standing outside of the vehicle to let him out. The unidentified
female MPD officer, or upon information and belief Defendant Lynch, responded, "I can't let
you out of this car." Plaintiff Nou asked, "why is that?" but the officer ignored him and did
not respond.

149.    A few seconds later, Plaintiff Nou stated "Let me out of this car. I want to get out of this
car. You have no right to keep holding me in this car. You have no right." The unidentified
female MPD officer, or upon information and belief Defendant Lynch, responded again, "I
can't let you out of this car." Plaintiff Nou asked, "Why is that?" The unidentified female
MPD officer, or upon information and belief Defendant Lynch, responded, "Because this was
just a critical incident and you have to be taken down to be formally interviewed by an
investigator. I don't have the capability of doing that. We're gonna do our best to get you
down there as soon as possible." Plaintiff Nou repeatedly said, "No, no." "You have no right
to hold me in this fucking car. For what? You have no right." "For this?"

150.     The unidentified female MPD officer, or upon information and belief Defendant Lynch, responded, "You have to be taken down and be interviewed by an investigator." Plaintiff Nou responded, "No, do not take me! Because I do not want to fucking go over there. Get me the fuck out." Defendant Lynch responded, "You don't have a choice. We have to take you over there." Plaintiff Nou responded, "So basically you guys are forcing me. You forced me to get inside this fucking car and then force me to stay in the fucking vehicle." Defendant Lynch responded, "I'm sorry you feel that way."

151.     Plaintiff Nou continued to demand to be let out of Patrol Vehicle 2 so that he could check on his grandmother. Defendant Lynch said, "Your grandmother is not outside, she is being taken care of." Plaintiff Nou demanded to be let out of the vehicle. Defendant Lynch responded, "I cannot let you out." Plaintiff Nou said, "Supposedly to protect and serve." Defendant Lynch then asked Plaintiff Nou, "What's your last name?" Plaintiff Nou responded, "I don't need to tell you my last name." Defendant Lynch responded, "Ok, they'll get that down there. That's fine."

152.     At 4:11, Plaintiff Nou again repeated to be let out of the vehicle to speak to his grandmother, whose son was just shot. Plaintiff Nou stated, "My grandma. She just saw her son get shot up! How are you gonna feel if you are in my grandma's shoes? She's scared." Defendant Lynch responded, "Your grandmother is being taken to the hospital." Plaintiff Nou responded, "Let me go to hospital with her then!" Defendant Lynch responded, "I cannot let you go to the hospital." Plaintiff Nou continued to scream, "I don't want to be in here. Why did you tell me to get inside the car? I didn't want to get in."

153.     Defendant Lynch again said, "You have to be taken down to be interviewed."

154.     At 4:13, Plaintiff Nou again said he wanted out of Patrol Vehicle 2 and to go find his

brothers and sisters, that he wanted out, and did not want to stay in Patrol Vehicle 2 any

longer.

155.     At 4:14, Plaintiff Nou asked Defendant Lynch, "Is my dad dead?" Defendant Lynch

responded, "I do not know that information right now. I didn't ride with him to the hospital

so I can't tell you. I honestly don't know. If I had information I could tell you, I would tell

you." Plaintiff Nou asked, "Is there any way you can find out?" Defendant Lynch responded,

"If they let me know, you will know, okay?" Upon information and belief, Defendant Lynch

falsely told Plaintiff Nou she did not know the answer to his question, as Chiasher Vue was

pronounced dead at 4:05 am, and it was communicated over the MPD radio dispatch  shortly

thereafter. Moreover, Defendant Lynch could have made a simple inquiry to dispatch for

such information.

156.     At approximately 4:17, while Plaintiffs were still locked in patrol vehicles, Defendants

Carlson and/or Delmonico directed the Plaintiffs to be transferred to MPD.

157.     Defendant Delmonico directed the Plaintiffs to be transported to MPD headquarters in

the squad cars.

158.     At approximately 4:17 am, Defendant Lynch exited the patrol vehicle and then returned

to Patrol Vehicle 2 shortly thereafter. Plaintiff Nou continued to ask to be let out of the

vehicle. Defendant Lynch ignored Plaintiff Nou's demands and requests and drove away

from the crime scene with Plaintiff Nou in the back seat.

**MPD Headquarters-Chamee**

159.    At approximately 4:35 am, Plaintiff Chamee Vue was taken to MPD headquarters

located at 350 South 5th Street, Minneapolis, Minnesota 55415, by Defendant Davis and

placed into Interview Room O.

160.    Upon arrival at MPD headquarters, Defendants Davis and Lynch escorted Plaintiffs

Chamee and Nou through multiple floors, up and down and several flights of stairs to

multiple locked doors where they could not gain access to the intended areas.

161.    Ultimately, before entering a hallway, Defendant Davis informed both Plaintiffs Chamee

and Nou that he would have to search them, wand them, and take their cell phones and

belongings before they were placed into separate rooms.

162.     Defendant Lynch searched Plaintiff Chamee, patted her down, wanded her, took her

personal items, including cell phone and keys, and placed here in Interview Room O—a

locked door, from which Plaintiff Chamee could not and did not believe she could exit.

163.    A few minutes after Plaintiff Chamee was locked in Interview Room O, Defendant

Lynch used a key to unlock the door to Interview Room O, entered, and asked Plaintiff

Chamee her name, date of birth, and phone number. Then, Defendant Lynch used a key to

unlock the door to exit Interview Room O.

164.    Approximately two hours after being locked in Interview Room O, BCA investigator,

James Reyerson ("Reyerson") and another unidentified male unlocked the door and entered

Interview Room O to tell Plaintiff Chamee that they would interview her soon. In response to

whether she needed anything, Plaintiff Chamee responded "I am worried. I am antsy to get

out of here and to get an update." Upon information and belief Reyerson falsely stated that he

had no updates for her, although Plaintiffs' father had died nearly three hours earlier and

Reyerson was well aware that Chiasher Vue was deceased.

165.    After approximately four (4) hours in the locked room at MPD headquarters and five (5)

hours of total detention, Reyerson and another BCA investigator Scott Mueller ("Mueller")

began their interview of Plaintiff Chamee at approximately 8:36 am.

166.    Reyerson immediately began asking Plaintiff Chamee to tell him what she saw happen

that morning.

167.    Reyerson asked Plaintiff Chamee questions about her father's personality and

temperament---all facts and questions unrelated to the facts and circumstances surrounding

the MPD's shooting and killing of Chiasher Vue several hours earlier.

168.    Reyerson asked Plaintiff Chamee questions about her father's mental health and changes

in his behavior.

169.    After a few minutes of questioning, Mueller asked Plaintiff Chamee if she had been in

contact with her siblings, although she had been locked in a room for five (5) hours and

without her cell phone. Plaintiff Chamee responded that she had not been in contact with

anyone and that her cell phone had been taken away from her. She stated that one of her

brothers was headed to the hospital but that she still had "no clue" about the status of her

father.

170.    After approximately seven (7) minutes of questioning, over four hours after her father

had passed away, nearly five (5) hours of detention, and despite several requests regarding

the status of her father, Reyerson notified Plaintiff Chamee that her father was dead. Plaintiff

Chamee asked whether her brothers had been notified and both Reyerson and Mueller stated

"No, not yet."

171.    Mueller statesd "We want to be as honest as we possibly can and we don't want to keep anything from you." Upon information and belief, this statement was intentionally false and misleading because Mueller knew that he was keeping the death of Chiasher Vue from all of the family members for nearly five (5) hours so that they could ask her a handful of questions lasting approximately seven (7) minutes—none of which related to the facts and circumstances surrounding the shooting of Chiasher Vue by MPD, five hours earlier.

172.    Weeping, Plaintiff Chamee pleaded, "I just want my phone back."

173.    Mueller assured Plaintiff Chamee that he, as a BCA officer, did not work for the MPD and that his job was to "investigate the police officers' use of force."

174.    Approximately twelve minutes after they entered locked Interview Room O, Defendants Reyerson and Mueller exited Interview Room O and retrieved Plaintiff Chamee's cell phone.

175.    Shortly thereafter, an MPD officer who identified himself as "Jason" entered the room with a female "chaplain," while another unidentified female MPD officer returned Plaintiff Chamee's phone to her.

176.    MPD officer Jason and the chaplain sat in the room with Plaintiff Chamee and watched her weep.

177.    Finally, Plaintiff Chamee asked for privacy so that she could finally make some calls to her family. MPD officer Jason and the chaplain exited but MPD officer Jason unlocked the Interview Room O door from the inside so that Plaintiff Chamee would now be able to exit.

**MPD Headquarters-Benjamin Vue**

178.    At approximately 5:10 am, Plaintiff Benjamin Vue was taken to MPD headquarters located at 350 South 5th Street, Minneapolis, Minnesota 55415, by Defendant Hain and placed into Interview Room F.

179.    Plaintiff Benjamin Vue was patted down and his cell phone was taken from him by Defendant Hain before he entered Interview Room F.

180.    Defendant Hain stood guard and remained outside of Interview Room F while Plaintiff Benjamin Vue was locked therein.

181.    Nearly an hour after entering the locked Room F, Plaintiff Benjamin Vue knocked on the door of the interview room to request pants because he was cold, as he only had on shorts. Defendant Hain responded that they didn't have anything for him. Plaintiff Benjamin Vue then asked to use the restroom. Defendant Hain escorted Plaintiff Benjamin Vue to the restroom and escorted him back to the interview room and closed the locked door.

182.    An unidentified nonuniformed individual entered Interview Room F and requested Plaintiff Benjamin's information. He then falsely stated to Plaintiff Benjamin that they were "still working" on his father at the hospital. Upon information and belief, this unidentified nonuniformed individual knew that Chiasher Vue had died several hours earlier. This same individual also indicated that the interviewers went to seek permission from his family to speak to Plaintiff Benjamin Vue--a minor--and that they would be right there. Upon information and belief, no such permission was ever requested or granted.

183.    Nearly two hours after Plaintiff Benjamin said he was cold, an unidentified male unlocked the door to Interview Room F and provided Plaintiff Benjamin Vue with a coat.

184.    Four hours after he was first placed into locked Room F, at approximately 9:12 am, Reyerson and Mueller unlocked Interview Room F and entered the room and began questioning Plaintiff Benjamin Vue, without parental authorization and without a parent present.

185.    Reyerson and Mueller asked Plaintiff Benjamin questions about the evening's events, most of which were unrelated to the facts and circumstances of the shooting death of his father.

186.    After approximately seven (7) minutes of questioning, Mueller exited the room and retrieved Plaintiff Chamee to enter the room. Reyerson asked Plaintiff Chamee if she wanted them to "talk to him" (i.e., tell him that their father was dead). Plaintiff Chamee responded "Would I be able to talk to him?"  Reyerson stated, "oh, would you like us to leave?" Plaintiff Chamee responded "Yes."

187.    Once Plaintiffs Chamee and Benjamin were in the room alone, Plaintiff Chamee informed Plaintiff Benjamin that their father "did not make it." As the Plaintiffs wept, the video recordings continued.

**MPD Headquarters-Hailee Vue**

188.    At approximately 4:30 am, Plaintiff Hailee Vue was taken to MPD headquarters located at 350 South 5th Street, Minneapolis, Minnesota 55415, by Defendants Gottsch and Phernetton and placed into Interview Room T.

189.    Defendants Gottsch and Phernetton stood guard outside of Interview Room T and at some point Plaintiff Hailee requested to use the restroom. Defendant Gottsch escorted Plaintiff Hailee to the restroom and escorted him back to Interview Room T.

190.    At some point, Defendants Gottsch and Phernetton were replaced by another MPD officer to stand guard outside of Interview Room T.

191.    After nearly six (6) hours of being held in a locked patrol vehicle and interview room, Reyerson and Mueller began their interview of Hailee at approximately 8:49 am.

29

192.   Reyerson and Mueller asked for Plaintiff Hailee's information. Plaintiff Hailee
interrupted them and said, "How's my dad?" Instead of providing a direct answer, Reyerson
ignored Plaintiff Hailee's question and said, "We'll get to all of that" after Plaintiff Hailee
provided them with basic information.

193.   After Plaintiff Hailee continued to refuse to provide his information, Mueller informed
Plaintiff Vue that his father passed away at the hospital.

194.   At this point, Plaintiff Hailee said, "I don't want to say anything more. … I just want to
go home. Just let me go home, okay? I'm done." Reyerson and Mueller continued to ask
questions about what happened that night from Plaintiff Hailee. Instead, Plaintiff Hailee
responded multiple times regarding being locked inside a squad car against his will and his
inability to get out.

195.   In response to Mueller claiming that he was there to investigate the police officers and
not Plaintiff Hailee or his family, Plaintiff Hailee stated, "Yeah, just like how they fucking
locked us on [sic] there. We told em, get, we don't wanna be there man. They have no right
to fucking detain us in there. They fucking left us in there." Mueller responded, "In the squad
cars?" Plaintiff Hailee, responded "Yes. Just like me. I was there in a fucking squad car with
no fucking heat at all. I was freezing my ass off in the fucking, first squad car. I just want to
go home. See my kids. And now I have to go tell my kids their, their grandfather passed
away because the officer didn't want to listen to us because you know, we know our dad
best. They had to fucking go in there like Rambo and fucking shot everybody in there. I just
want to go home."

**MPD Headquarters-Nou Vue**

196.    At approximately 4:18 am, Plaintiff Nou Vue was taken to MPD headquarters located at 350 South 5th Street, Minneapolis, Minnesota 55415, by Defendant Lynch and placed in Interview Room M.

197.    After several hours of being locked in Interview Room M, Reyerson, Defendant Davis, and an unidentified male unlocked and entered Interview Room M.

198.    Reyerson falsely told Plaintiff Nou that he had no updates for him and that they were still interviewing the officers involved. Plaintiff Nou was worried about his younger, minor brother Benjamin. Reyerson informed Plaintiff Nou that he was in an interview room and apologized for any misinformation he might have received about Plaintiff Benjamin.

199.    At approximately 8:58 am, BCA investigators Reyerson and Mueller entered Interview Room M and Plaintiff Nou immediately asked, "Is my dad dead?" Instead of directly responding to Plaintiff Nou's question, Reyerson began to talk about the scene and MPD's actions and that his father was taken to the hospital. Plaintiff Nou asked why he wasn't able to speak to his father. Reyerson said he did not have any answers for him and then proceeded to talk about the BCA—again, without directly answering Plaintiff Nou's direct question about his dad's status. Plaintiff Nou pressed and asked again, "Is he dead or is he alive?" Reyerson finally informed Plaintiff Nou that he was pronounced dead at the hospital— unbeknownst to Plaintiff Nou, his father died five hours earlier that morning.

200.    Seconds after informing Plaintiff Nou that his father was dead, Mueller continued to ask for more information about the events that morning and his father.

201.    Mueller asked Plaintiff Nou questions about his father's history with his children—facts and circumstances completely unrelated to the shooting of Chiasher Vue several hours

earlier. Plaintiff Nou complained that he heard and saw everything while he was forced to be locked in the back of the Patrol Vehicle.

202.    Instead of asking questions about the unlawful detention that Plaintiff Nou raised and complained about, Reyerson and Mueller ignored these issues and asked to go back to the argument between Chiasher Vue and Plaintiff Benjamin Vue earlier that morning.

203.    Plaintiff Nou repeatedly complained to Reyerson and Mueller that he was forced into the patrol vehicle and that he told the officers he didn't want to go or stay in the back of the locked patrol vehicle. There was no response from Mueller or Reyerson.

204.    Plaintiff Nou again complained that he was locked in a room and patrol car for hours and held against his will while his father was dying at the hospital and he was not allowed to go and see him.

205.    Reyerson asked Plaintiff Nou if, at the time of the shooting, whether he could see his father and hear the radio traffic. Plaintiff Nou responded yes to both questions.

206.    After approximately twelve (12) minutes of questioning, nearly five (5) hours after his father passed away, nearly six (6) hours of detention, and despite several requests regarding the status of his father and dozens of frantic pleas to be released, Reyerson and Mueller released Plaintiff Nou.

207.    After Mueller and Reyerson completed their questioning of Plaintiff Nou, an unidentified MPD officer asked Mueller and Reyerson if Plaintiff Chamee could go into the interview with Plaintiff Benjamin. Mueller denied that request and ordered them to continue to be separated and detained because he did not want Plaintiff Benjamin to not speak to them.

208.    At approximately 10:00 am Plaintiffs Hailee, Nou, Chamee, and Benjamin were

transported by MPD from MPD headquarters in the back seat of MPD patrol vehicles to a

family member's home in Brooklyn Center.

## IV.    CLAIMS FOR RELIEF

### CLAIM I: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### FOURTH AMENDMENT-EXCESSIVE FORCE
### (By PLAINTIFF MAI VUE, on her own behalf and as trustee
### for the estate of CHIASHER VUE and MAI YANG YANG against DEFENDANTS:
### DELMONICO, JACKSON, CARLSON, CRAYTON, LEDMAN, MOUA,
### POND, REED, WOLFF, WOMBLE, and YANG)

209.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

210.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a

deprivation under color of law of a right, privilege, or immunity secured to them by the

Fourth Amendment to the United States Constitution.

211.    Defendants unnecessarily used deadly force against Chiasher Vue, either acting

individually or jointly with other Defendants.

212.    The facts and circumstances outlined in detail above show that Defendants' acts of

shooting and killing Chiasher Vue were unjustified and objectively unreasonable.

213.    Defendant Moua, at the direction of Defendant Carlson, created an unnecessary and

heightened danger when he urged Chiasher Vue to come outside to talk to him. Instead of a

waiting for a trained and qualified negotiator who was on her way, or perhaps even on scene,

Defendant Moua, at the direction of Defendant Carlson, failed to inform other armed MPD

officers that he was communicating with Chiasher Vue.

214.   Defendant Moua, at the direction of Defendant Carlson, encouraged Chiasher to come outside where there were dozens of firearms pointed and ready to fire at him and without any clear coordination or tactical plan for engagement with Chiasher Vue.

215.   Defendant Moua, at the direction of Defendant Carlson, affirmatively placed Chiasher Vue at significant risk of serious, immediate and proximate harm and death. It was unreasonable, unnecessary, and reckless for Defendant Moua to insist on Chiasher's exit from the house when a trained and qualified negotiator was on her way or present at the scene. Moreover, it was unreasonable, unnecessary, and reckless for Defendant Moua to not be outside when Chiasher Vue exited the house to speak with him.

216.   Upon information and belief, a discharge, whether lethal or less lethal was discharged at Chiasher Vue by MPD and a barrage of contagious shots were discharged simultaneously or seconds thereafter.

217.   Defendants deliberately and intentionally used their firearms in concert with each other no less than 60 times to kill Chiasher Vue.

218.   Defendant Moua and the shooting MPD Defendants acted with deliberate indifference to Chiasher Vue's constitutional rights to be from the use of excessive force—a danger and harm that was created by Defendant Moua and the other MPD Defendants who shot Chiasher Vue and MPD Defendants who could have prevented the danger and harm.

219.   Defendants' actions and inactions constituted deliberate indifference to the recognized and standard safety and tactical procedures to avoid the unnecessary and excessive use of deadly force against a human being.

220.   Defendants' actions and inactions shock the conscience because they invited Chiasher Vue to a firing squad under false pretenses by an unqualified MPD negotiator. The incident

was a critical incident that went beyond the expertise and qualifications of Defendant Moua

and other MPD officers on scene. Defendants knew that they were not qualified to proceed as

they did, and they did anyway.

221.    Each Defendant's, or in concert with each other, intentionally shooting at Chiasher Vue

constituted deadly force and created a substantial likelihood of death or serious bodily injury.

222.    Defendants are not entitled to qualified immunity.

223.    Defendants used excessive and unjustified force against Chiasher Vue in violation of his

constitutional right sunder 42 U.S.C. § 1983 and the Fourth Amendment to the U.S.

Constitution.

224.    As a direct, proximate, and foreseeable result of Defendants' actions, Chiasher Vue

suffered traumatic injuries, pain, and death.

225.    As a direct, proximate, and foreseeable result of Defendants' actions, Mai Yang Yang

suffered traumatic physical injuries and pain.

**CLAIM II: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**FOURTEENTH AMENDMENT-EQUAL PROTECTION**
**(By PLAINTIFFS MAI VUE, on her own behalf and as trustee**
**for the estate of CHIASHER VUE and MAI YANG YANG**
**against DEFENDANTS: DELMONICO, JACKSON, CARLSON, CRAYTON,**
**LEDMAN, MOUA, POND, REED, WOLFF, WOMBLE, and YANG)**

226.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

227.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a

deprivation under color of law of a right, privilege, or immunity secured to them by the

Fourteenth Amendment to the United States Constitution.

228.    Chiasher Vue is Hmong, Asian, and a person with limited English proficiency.

35

229.   Defendants intentionally discriminated against Chiasher Vue on the basis of race and/or national origin.

230.   Upon information and belief, non-Hmong, non-Asian, and/or English-speaking individuals who are or have been similarly situated with MPD (i.e., involved in a critical incident involving SWAT or negotiator) are provided a qualified and trained negotiator to prevent or minimize unnecessary death and harm.

231.   Upon information and belief, had Chiasher Vue not been Hmong, Asian, or English-speaking, his constitutional rights would not have been deliberately ignored and violated by an unqualified "negotiator" and he would not have been falsely lured to be shot by multiple MPD officers.

232.   Upon information and belief, had Chiasher Vue not been Hmong, Asian, or English-speaking, MPD Defendants would have followed protocol and procedures.

233.   For example, on December 1, 2019, fourteen (14) days before Chiasher Vue's shooting, MPD SWAT and negotiators responded to a scene after reports of shots fired.[2] Even though there was additional gunfire coming from inside the residence after MPD arrived, SWAT personnel and negotiators made numerous attempts to contact people inside the residence. After waiting for four (4) hours, a robot was deployed into the residence and identified two deceased bodies. Upon information and belief, the involved individual was not Hmong, not Asian, and spoke English.

---

[2] *See e.g.,* https://www.facebook.com/page/197191512515/search/?q=swat December 1, 2019 post.

234.    In another example, MPD SWAT and negotiators safely negotiated for four hours with a man threatening to kill his three-year old daughter.[3] MPD SWAT and negotiators were able to safely and peacefully take the man into custody. Upon information and belief, the involved individual was not Hmong, not Asian, and spoke English.

235.    Upon information and belief, the above examples, along with MPD policies and procedures, reflect the standard procedures and policies for engaging with individuals similarly situated as Chiasher Vue on December 15, 2019. However, Chiasher Vue, because of his race, ethnicity, and/or limited English proficiency, was subjected to undue harm and danger by the MPD contrary to their own standards, policies, and procedures.

236.    Other similarly situated individuals who are not Hmong, not Asian, and/or speak English, would never have had an unqualified individual, such as Defendant Moua, leading and initiating a critical incident negotiation.

237.    There was no rational basis to treat Chiasher Vue differently from other similarly situated individuals. A critical incident, under MPD policies and procedures, required a qualified negotiator *because* it was a critical incident.

238.    As a direct, proximate, and foreseeable result of Defendants' discriminatory actions and unequal treatment of Chiasher Vue, he suffered traumatic injuries, pain, and death.

239.    As a direct, proximate, and foreseeable result of Defendants' actions, Mai Yang Yang suffered traumatic physical injuries and pain.

---

[3] *See e.g.,* https://www.facebook.com/page/197191512515/search/?q=swat September 10, 2015 post.

**CLAIM III: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**FOURTH AMENDMENT-UNLAWFUL SEIZURE/SEARCH/EXCESSIVE FORCE**
**(By PLAINTIFFS HAILEE VUE, NOU VUE, CHAMEE VUE, and BENJAMIN VUE,**
**against DEFENDANTS: DELMONICO, JACKSON, CARLSON, DAVIS, GOTTSCH,**
**HAIN, LEDMAN, LYNCH, POND, WOLFF, and PHERNETTON)**

240. Plaintiffs incorporate all paragraphs, as though fully set forth herein.

241. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seeks to redress a

deprivation under color of law of a right, privilege, or immunity secured to them by the

Fourth Amendment to the United States Constitution.

242. The Fourth Amendment protects Plaintiffs from an unreasonable search and seizure.

243. The unlawful seizure, search, and prolonged detention of Plaintiffs by Defendants at the

scene and at MPD headquarters for over six (6) hours, and each of them, was without lawful

basis, reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto,

or justification or excuse, and were thus unreasonable and in violation of Plaintiffs' Fourth

Amendment rights.

244. The unlawful, nonconsensual, and forcible detention of each of the Plaintiffs for nearly

six (6) hours, and each of them, was without any lawful basis, reasonable suspicion, probable

cause, or warrant, or any recognized exceptions thereto, or justification or excuse, and was

thus unreasonable and in violation of Plaintiffs' Forth Amendment rights.

245. Plaintiffs were told by one or more Defendants and on one or more occasions that they

were not free to leave, they were locked in a patrol vehicle, and they were locked in a room

at MPD headquarters. None of the Plaintiffs believed they were free to leave explicitly and

implicitly.

246. Each Plaintiff's detentions were unreasonable and impermissible by any reasonable

standards and continued under unreasonable conditions.

**CLAIM IV:  VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**FOURTH AMENDMENT-UNLAWFUL SEIZURE OF PROPERTY**
**(By PLAINTIFFS HAILEE VUE, NOU VUE, CHAMEE VUE, and BENJAMIN VUE,**
**against DEFENDANTS: DELMONICO, JACKSON, CARLSON, DAVIS, GOTTSCH,**
**HAIN, LEDMAN, LYNCH, POND, WOLFF, and PHERNETTON)**

247.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

248.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a

deprivation under color of law of a right, privilege, or immunity secured to him by the Fourth

Amendment to the United States Constitution.

249.    The Fourth Amendment protects Plaintiffs from an unreasonable search and seizure.

250.    The unlawful search of their bodies and seizure of Plaintiffs' personal property,

including, but not limited to, their wallets, keys, and cell phones, was without lawful basis,

reasonable suspicion, probable cause, or warrant, or any recognized exceptions thereto, or

justification or excuse, and were thus unreasonable and in violation of Plaintiffs' Fourth

Amendment rights.

251.    Each Plaintiff's search of their bodies and seizure of their personal items was

unreasonable and impermissible by any reasonable standards and without any legal basis.

**CLAIM V: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)**
**FIRST AMENDMENT-FREE SPEECH**
**(By PLAINTIFFS HAILLE and NOU VUE against Defendant LEDMAN OR WOLFF)**

252.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

253.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a

deprivation under color of law of a right, privilege, or immunity secured to him by the First

Amendment to the United States Constitution.

254.    The First Amendment guarantees Plaintiffs' freedom of speech and expression permitting Plaintiffs to, *inter alia*, freely and lawfully express opinions or ideas. This expression may be accomplished verbally, demonstratively, and/or symbolically.

255.    Plaintiffs pleaded on multiple occasions to be released from his unlawful detention or to be provided a basis for his unlawful detention. They were repeatedly denied by one or more Defendants, as outlined above. Moreover, Defendant Ledman or Wolff specifically directed Plaintiff Nou "stop asking."

256.    One or more Defendants acted deliberately and with malice and oppression to intimidate and/or silence Plaintiffs from exercising their right to free speech in furtherance of their constitutional right to not be unlawfully detained and seized by MPD Defendants.

**CLAIM VI: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
CONSPIRACY TO VIOLATE CIVIL RIGHTS
(By PLAINTIFFS HAILEE VUE, NOU VUE, CHAMEE VUE, and BENJAMIN VUE
against DEFENDANTS: DELMONICO, JACKSON, CARLSON, DAVIS, GOTTSCH,
HAIN, LEDMAN, LYNCH, POND, WOLFF, and PHERNETTON)**

257.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

258.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a deprivation under color of law of a right, privilege, or immunity secured to him by the First, Fourth, Fourteenth Amendments to the United States Constitution.

**Patrol Vehicles**

259.    At the scene, Defendants, and each of them, acted as described herein above, in conspiracy with, and with agreement, permission, ratification, and approval of each other and the State, through the BCA investigators, to violate Plaintiffs' civil rights afforded under the United States Constitution.

260.   Among other things, Defendants acted in conspiracy and with agreement, permission, ratification, and approval of each other and the State's, through the BCA investigators, joint conduct to 1) unlawfully detain Plaintiffs without probable cause or reasonable suspicion; 2) unlawfully conduct a prolonged detention of Plaintiffs without probable cause or reasonable suspicion; and 3) unlawfully search Plaintiffs without probable cause or reasonable suspicion.

261.   During the entirety of the Plaintiffs' detention in the patrol vehicles, each officer saw Plaintiffs' rights being violated, all Defendants acted in concert to detain and search Plaintiffs.

262.   One or more Defendants claimed that the unlawful detention and inability to release Plaintiffs was in furtherance of MPD's and/or BCA's procedures, investigation, and requirements.

**MPD Headquarters**

263.   At MPD headquarters, Defendants, and each of them, acted as described herein above, in conspiracy with, and with agreement, permission, ratification, and approval of each other and the State, through the BCA investigators, to violate Plaintiffs' civil rights afforded under the United States Constitution.

264.   Among other things, Defendants acted in conspiracy and with agreement, permission, ratification, and approval of each other and the State's, through the BCA investigators, joint conduct to 1) unlawfully detain Plaintiffs without probable cause or reasonable suspicion; 2) unlawfully conduct a prolonged detention of Plaintiffs without probable cause or reasonable suspicion; 3) unlawfully search Plaintiffs without probable cause or reasonable suspicion; and 4) unlawfully seized Plaintiffs' property without lawful basis.

265. During the entirety of the Plaintiffs' detention at MPD headquarters, each officer saw Plaintiffs' rights being violated, all Defendants acted in concert to detain, search Plaintiffs and their property.

266. One or more Defendants claimed that the unlawful detention and inability to release Plaintiffs was in furtherance of MPD's and/or BCA's procedures, investigation, and requirements.

267. As outlined above, BCA investigator, Scott Mueller instructed MPD to continue to detain and keep Plaintiffs separate to further their unlawful detention.

**CLAIM VII: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
UNCONSTITUTIONAL POLICY, CUSTOM, OR PROCEDURE (*Monell)*
(By ALL PLAINTIFFS against DEFENDANT CITY OF MINNEAPOLIS)**

268. Plaintiffs incorporate all paragraphs, as though fully set forth herein.

269. This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a deprivation under color of law of a right, privilege, or immunity secured to him by the First, Fourth, Fourteenth Amendments to the United States Constitution.

270. Defendant City of Minneapolis violated Plaintiffs' constitutional rights, as alleged herein, by creating and maintaining unconstitutional customs and practices, *inter alia*:

a. Defendant City of Minneapolis has a *de facto* policy, custom, and/or practice of condoning, ratifying, failing to discipline, failing to investigate, and of retaining, personnel who use excessive and/or unjustified force upon persons with whom they come into contact in violation of their Fourth Amendment rights.

b. Defendant City of Minneapolis has a *de facto* policy, custom, and/or practice of condoning, ratifying, failing to discipline, failing to investigate, and of retaining,

personnel who falsely and unlawfully detain persons in violation of their Fourth Amendment rights.

c. Defendant City of Minneapolis has a *de facto* policy, custom, and/or practice of condoning, ratifying, failing to discipline, failing to investigate, and of retaining, personnel who discriminate against individuals in violation of their Fourteenth Amendment rights.

d. Defendant City of Minneapolis has a *de facto* policy, custom, and/or practice of condoning, ratifying, failing to discipline, failing to investigate, and of retaining, personnel who retaliate against and suppress the speech of individuals who exercise their First Amendment rights.

271. Defendant City of Minneapolis's policies or customs caused and were the moving force and/or affirmative link behind some or all of the violations of Plaintiffs' constitutional rights at issue in this case.

272. Plaintiffs are informed, believe, and thereupon allege that these policies, practices, customs, and procedures are intentional and/or the result of deliberate indifference on the part of Defendant City of Minneapolis, by and through its decisionmakers.

273. The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Plaintiffs.

274. Plaintiffs specifically allege that Defendant City of Minneapolis's policy, custom, and/or practices, as described herein, were within the control of Defendant City of Minneapolis and within the feasibility of Defendant City of Minneapolis, to alter, adjust, and/or correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

### CLAIM VIII: VIOLATION OF CIVIL RIGHTS (42 U.S.C. § 1983)
### FAILURE TO TRAIN, SUPERVISE, DISCIPLINE, OR CORRECT (*Canton*)
### (By ALL PLAINTIFFS against DEFENDANT CITY OF MINNEAPOLIS)

275.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

276.    This cause of action arises under 42 U.S.C. § 1983, wherein Plaintiffs seek to redress a

deprivation under color of law of a right, privilege, or immunity secured to him by the First,

Fourth, Fourteenth Amendments to the United States Constitution.

277.    Defendant City of Minneapolis violated Plaintiffs' constitutional rights, as alleged herein,

by failing to train, supervise, discipline, or correct the following unconstitutional customs

and practices, *inter alia*:

   a.   Defendant City of Minneapolis knew or should have known that MPD officers

        regularly engage in the misdeeds set forth in this entire complaint. Defendant City of

        Minneapolis knew or should have known about these misdeeds, based on claims for

        damages, use of force reports, SWAT incidents, and Operation 100 designations.

   b.    Use excessive and/or unjustified force upon persons with whom they come into

        contact in violation of their Fourth Amendment rights.

   c.   Falsely and unlawfully detain persons in violation of their Fourth Amendment rights.

   d.   Discriminate against individuals in violation of their Fourteenth Amendment rights.

   e.   Retaliating against and suppress the speech of individuals who exercise their First

        Amendment rights.

   f.   Defendant City of Minneapolis has failed to properly train, supervise, and/or

        discipline employees, officers, managers, and supervisors within the MPD as to the

        legal requirements and protections applicable to persons as set forth in the United

        States and Minnesota Constitutions, and other laws; and

278.    The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Plaintiffs.

279.    Defendants Delmonico, Jackson, and Carlson acted in a supervisory capacity with respect to the incidents involving Plaintiffs. In that capacity, Defendants Delmonico, Jackson, and Carlson acted intentionally, maliciously, in conscious disregard, and/or with deliberate indifference to the rights of Plaintiffs.

280.    These supervisory failures of Defendants Delmonico, Jackson, and Carlson directly caused and contributed to Plaintiffs' damages.

281.    Defendant City of Minneapolis's lack of training, supervision, discipline, and correction caused and were the moving force and/or affirmative link behind some or all of the violations of Plaintiffs' constitutional rights at issue in this case.

282.    Plaintiffs are informed, believe, and thereupon allege that  Defendant City of Minneapolis' lack of training, supervision, discipline, and correction are intentional and/or the result of deliberate indifference on the part of Defendant City of Minneapolis, by and through its decisionmakers.

283.    The foregoing unconstitutional customs and practices were a direct and legal cause of harm to Plaintiffs.

284.    Plaintiffs specifically allege that Defendant City of Minneapolis's policy, custom, and/or practices, as described herein, were within the control of Defendant City of Minneapolis and within the feasibility of Defendant City of Minneapolis, to alter, adjust, and/o0r correct so as to prevent some or all of the unlawful acts and injury complained of herein by Plaintiffs.

## CLAIM IX: VICARIOUS LIABLIITY
### (By ALL PLAINTIFFS against DEFENDANT CITY OF MINNEAPOLIS)

285.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

286.    The City of Minneapolis is liable for the torst of its agents.

287.    The City of Minneapolis is liable for the acts of the MPD Defendants' conduct because

they were acting within the scope of their employment when they caused and contributed to

the Plaintiffs' injuries.

288.    The MPD Defendants' conduct is imputable to the City of Minneapolis as its agents

under the vicarious liability doctrine.

289.    The MDP Defendants' willful conduct occurred during the scope of their employment

and caused or contributed to Plaintiffs' injuries.

## CLAIM X: WRONGFUL DEATH
### (By Plaintiff Mai Pha Vue, on her own behalf and as Trustee for the ESTATE OF CHIASHER VUE against DEFENDANT CITY OF MINNEAPOLIS, and DEFENDANTS: DELMONICO, JACKSON, CARLSON, CRAYTON, LEDMAN, MOUA, POND, REED, WOLFF, WOMBLE, and YANG)

290.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

291.    Chiasher Vue was killed by MPD Defendants on December 15, 2019.

292.    Plaintiffs are entitled to bring an action to recover pecuniary damages for loss of income,

contributions, services, advice, comfort, and protection, as well as funeral costs.

293.    Defendants owed a duty to Chiasher Vue and breached their duty to exercise reasonable

care when undertaking their duties so as to not endanger the lives and safety of persons with

any foreseeable zones of risk created by such activities.

294.    Defendants breached their duty of care by, *inter alia,* shooting and killing Chiasher Vue.

295.   Chi Asher Vue's death was proximately caused by the deliberate failures of MPD

Defendants and the City of Minneapolis

### CLAIM XI: FALSE IMPRISONMENT
**(By PLAINTIFFS HAILEE VUE, NOU VUE, CHAMEE VUE, and BENJAMIN VUE against DEFENDANTS: CITY OF MINNEAPOLIS, DELMONICO, JACKSON, CARLSON, DAVIS, GOTTSCH, HAIN, LEDMAN, LYNCH, POND, WOLFF, and PHERNETTON)**

296.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

297.   Defendants, by their above-described actions, wrongfully, illegally, and unjustifiably

confined and restrained Plaintiffs without their consent, and thereby falsely imprisoned them.

### CLAIM XII: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
**(By ALL PLAINTIFFS against ALL DEFENDANTS)**

298.   Plaintiffs incorporate all paragraphs, as though fully set forth herein.

299.   As outlined in detail above, Defendants' unconstitutional actions above were extreme and

outrageous. Defendants' acts include, but are not limited to, knowing and intentionally:

   a.   Using an unqualified and inexperienced police officer, Defendant Moua, at the

   direction of Defendant Carlson, to urge Chiasher Vue to come outside to be shot and

   killed by MPD officers;

   b.   Subjecting Plaintiffs to visually witnessing and hearing multiple MPD officers

   shooting Chiasher Vue as a result of contagious fire;

   c.   Subjecting Plaintiff Mai Yang to multiple shots fired at her and witnessing the

   shooting of her son, Chiasher Vue.

   d.   Locking Plaintiffs Hailee, Nou, Chamee, and Benjamin Vue in the back of locked

   patrol vehicles, some without any heat during subzero freezing temperatures and

   despite repeated pleas to be released;

e.  Subjecting Plaintiffs Chamee and Benjamin to negotiating with their father and hearing him being shot and killed by multiple rounds of gunfire while on the phone with him;

f.  Subjecting Plaintiffs Hailee, Nou, Chamee, and Benjamin to being locked in the back of patrol vehicles while the radio dispatch communications regarding the shooting of Plaintiffs' father and his extraction from the porch by a canine;

g.  Subjecting Plaintiffs Hailee and Nou to watching their father's lifeless body being carried directly in front of them to the ambulance, while they were locked in the patrol vehicle.

h.  Preventing Plaintiffs Hailee, Nou, Chamee, and Benjamin from being with their father at the hospital in the last minutes of his life.

i.  Intentionally misrepresenting and withholding the status of Chiasher Vue's death.

j.  Detaining Plaintiffs in multiple locations for over six (6) hours.

300.  Defendants' actions were intentional, reckless, and in complete disregard of Plaintiffs rights.

301.  Defendants caused and continues to cause Plaintiffs severe and extreme emotional distress.

### CLAIM XIII: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (By PLAINTIFF MAI YANG YANG against ALL DEFENDANTS)

302.  Plaintiffs incorporate all paragraphs, as though fully set forth herein.

303.  As outlined above, Defendants had a duty to act reasonably under the circumstances described, including, but not limited to, their duties with respect to the events before, during, and after the shooting of Chiasher Vue.

304.    Plaintiff Mai Yang was in the home when nearly a hundred bullets were fired at her son, Chiasher Vue, and her home, wherein she was confined in a wheelchair.

305.    Plaintiff Mai Yang witnessed her son shot and killed while she was trying to protect herself from nearly 100 bullets entering her home.

306.    Plaintiff Mai Yang had an objectively reasonable fear for her own safety.

307.    As a direct and proximate result of the aforementioned conduct, Plaintiff Mai Yang suffered chest pains, if not a heart attack, continued to suffer serious bodily injury and emotional pain and suffering, all in an amount to be determined according to proof at trial.

### CLAIM XIV: NEGLIGENCE
### (By ALL PLAINTIFFS against ALL DEFENDANTS)

308.    Plaintiffs incorporate all paragraphs, as though fully set forth herein.

309.    This cause of action arises under the general laws and Constitution of the State of Minnesota.

310.    In performing all of the complained of acts and omissions throughout this Complaint by way of their conduct, Defendants, and each of them, have breached the duty to act reasonably under the circumstances described.

311.    As a direct and proximate result of the aforementioned conduct, Plaintiffs have suffered and continued to suffer great emotional pain and injury, all in an amount to be determined according to proof at trial.

312.    Defendant City of Minneapolis is liable to Plaintiffs for the acts of its public employees, the individual Defendants herein, for conduct and/or omissions herein alleged, pursuant to the doctrine of respondeat superior.

## V.      PRAYER FOR RELIEF

313.    WHEREFORE, Plaintiffs pay for the following relief from Defendants and each of them,

for each of the above causes of action:

a.   Compensatory damages, including general and special damages, according to proof;

b.   Punitive damages pursuant to 42 U.S.C. § 1983 and any other applicable laws or statues in an amount sufficient to deter and make an example of each non-governmental entity Defendant;

c.   Statutory damages, according to proof;

d.   Prejudgment interest according to proof;

e.   Reasonable attorney fees pursuant to 42 U.S.C. § 1983, 1988 and any other applicable provisions;

f.   Costs of suit;

g.   Injunctive relief to correct and prevent continued unlawful actions, including training and monitoring; and

h.   Such further relief as this Court deems just and proper.


Dated: December 13, 2021                        **GOLDENBERGLAW, PLLC**

By__/s/ Marlene Goldenberg_____
Marlene Goldenberg (#0394943)
800 LaSalle Avenue, Suite 2150
Minneapolis, Minnesota 55402
(612) 333-4662
mjgoldenberg@goldenberglaw.com

-and-

**MAY LIGHTFOOT, PLLC**
Je Yon Jung (*pro hac vice* pending)
(Washington, DC Bar #495154)

50

3200 Martin Luther King Jr. Blvd. SE
3rd Floor
Washington, DC 20032
(202) 918-1824
jjung@maylightfootlaw.com

*Attorneys for Plaintiffs*