## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Mai Yang Yang, Hailee Vue, Nou Vue,
Chamee Vue, Benjamin Vue, and Mai
Pha Vue, on her own behalf and as
trustee for the estate of Chiasher Vue,

        Plaintiffs,

v.

City of Minneapolis; John Delmonico,
Richard Jackson, Troy Carlson,
Donnell Crayton, Ryan Davis,
Matthew Gottsch, Benjamin Hain,
Daniel Ledman, Rachael Lynch, Peng
Moua, Danielle Phernetton, Kyle
Pond, Andrew Reed, Travis Williams,
Jason Wolff, Aaron Womble, and Toua
Yang, in their individual and official
capacities,

        Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 21-2658 ADM/ECW

_____

Je Yon Jung, Esq., May Lightfoot Law PLLC, Washington, DC, and Marlene J Goldenberg, Esq., and Samantha Hoefs, Esq., Goldenberg Law, PLLC, Minneapolis, MN, on behalf of Plaintiffs.

Tracey Fussy, Esq., and Rebekah Murphy, Esq., Minneapolis City Attorney's Office, Minneapolis, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On April 20, 2022, the undersigned United States District Judge heard oral argument on Defendants City of Minneapolis, John Delmonico, Richard Jackson, Troy Carlson, Donnell Crayton, Ryan Davis, Matthew Gottsch, Benjamin Hain, Daniel Ledman, Rachael Lynch, Peng Moua, Danielle Phernetton, Kyle Pond, Andrew Reed, Travis Williams, Jason Wolff, Aaron Womble, and Toua Yang's (collectively "Defendants") Motion for Partial Judgment on the Pleadings [Docket No. 37].  For the reasons set forth below, Defendants' Motion is granted in part and denied in part.

## II.  BACKGROUND[1]

This tragic case arises from the officer-involved shooting of Chiasher Vue ("Vue") in December 2019.  Plaintiffs are Vue's spouse and trustee of his estate (Mai Pha Vue),[2] his mother (Mai Yang Yang ("Yang")), and four of his seven children (Hailee, Nou, Chamee, and Benjamin).[3]  Compl. [Docket No. 1] ¶¶ 2-8, 45.  At the time of the incident, Benjamin was 17 years old and Hailee, Nou, and Chamee were young adults.  Id. ¶ 8.  All Plaintiffs are ethnic Hmong.  Id. ¶ 9.  Vue was Hmong and Asian and had limited English proficiency.  Id. ¶¶ 9-10, 228.  Defendants are the City of Minneapolis ("City") and 17 police officers ("Officers") employed by the Minneapolis Police Department ("MPD").  Id. ¶¶ 12-30, 32.

At about 3:07 a.m. on the sub-zero morning of December 15, 2019, Benjamin called 911 to report that his father had discharged his gun in the family home.  Id. ¶ 47.  Family members who were home at the time included Vue, his 70-year-old mother Yang, who is wheelchair bound, and Benjamin, Hailee, Nou, and Chamee.  Id. ¶¶ 47, 49-50, 86.  MPD police units were dispatched to the family home in Minneapolis at 3:10 a.m.  Id. ¶ 48.

At the time Benjamin called 911, he was in a car parked near the house with his brothers Hailee and Nou.  Id. ¶ 49.  During the call the three brothers located their sister Chamee, and the four siblings went to a nearby intersection identified by the 911 dispatcher to meet with responding Officers.  Id.  ¶ 50.  Vue and Yang were still inside the home.  Id. ¶¶ 65, 86.  At 3:12

---

[1]  On a motion for judgment on the pleadings, all facts alleged in the Complaint are accepted as true.  Saterdalen v. Spencer, 725 F.3d 838, 841 (8th Cir. 2013).

[2]  On May 5, 2022, Plaintiffs filed a Suggestion of Death [Docket No. 58] stating that Plaintiff Mai Pha Vue died on or about March 19, 2022.  Plaintiffs state that a Motion for Substitution of Parties will be filed by the appropriate representative of Mai Pha Vue's estate.

[3] The four children's last names are also Vue.  For clarity, the children are referred to by their first names and are collectively referred to as "the Children".

a.m., Officers placed Chamee and Benjamin in the back seat of one patrol car and Hailee and Nou in the back seat of another.  Id. ¶¶ 51-53.  The patrol cars could not be opened from the back seat and were not heated.  Id. ¶¶ 52-53, 89, 108, 143, 195, 299(d).

The Children told several Officers that their father suffered from mental illness and depression.  Id. ¶¶ 64, 112.  They also told the Officers that their grandmother remained in the house.  The Children could hear everything that was happening over the police radios, and some of the Children could see their house from the squad cars.  Id. ¶¶ 93-94, 97, 119, 201, 205, 299(b)

At 3:18 a.m., Defendant Troy Carlson ("Sergeant Carlson"), the on-scene supervisor, initiated Operation 100, which "is a SWAT callout where on or off-duty SWAT Tactical, Negotiators, and Tech Team members respond to a hostile event, such as an active shooter or a barricaded suspect, which exceeds the capabilities of traditional law enforcement first responders and investigators."  Id. ¶¶ 16, 54-55.  Procedures for Operation 100 provide:  "The primary responsibility in all tactical situations is to prevent the loss of human life and to contain the threat.  Wherever possible, efforts will be directed toward peaceful resolution."  Id. ¶ 56 (quoting MPD Policy Number 7-801).

A trained SWAT negotiator was summoned to the scene; however, before she arrived Sergeant Carlson directed Defendant Peng Moua ("Officer Moua") to engage with Vue because Officer Moua spoke Hmong, the same language as Vue.  Id. ¶ 60-61.  Officer Moua had been a patrol officer for five years, but had no specialized critical incident training or expertise, and was not a qualified SWAT negotiator.  Id. ¶ 62.

Officer Moua asked Chamee to call her father on her cell phone.  Id. ¶ 65.  Officer Moua spoke to Vue and told him that he would help Vue.  Id. ¶ 66.  Vue stated that he only wanted to speak to Officer Moua and that he would come out to speak to him.  Id. ¶ 67.  Officer Moua

reassured Vue that it would be just him and Officer Moua talking.  Id. ¶ 68.  Vue came to the

front porch door at 3:44 a.m.  Id. ¶ 69.  Officer Moua was not in front of the house when Vue

came out.  Id. ¶ 70.  Vue saw nearly a dozen Officers shouting in English, running towards him,

and pointing their weapons at him.  Id. ¶ 72.  He went back inside a minute later.  Id. ¶ 74.

About two minutes later, at 3:47 a.m., Vue came back out to the front porch with a gun.

An Officer yelled, "He's got a gun!  He's got a rifle!"  Id. ¶ 76.  Seven Officers discharged their

firearms and one Officer discharged a less lethal rifle, resulting in 62 rounds being fired at Vue.

Id. ¶¶ 76-77.  Vue fired his rifle approximately six times while on the front porch.  Id. ¶ 78.  No

body worn camera or other recording shows who shot first.  Id. ¶ 79.

Vue sustained 13 bullet wounds and was taken by ambulance to the hospital, where he

was pronounced dead at 4:05 a.m.  Id. ¶¶ 80, 82, 84.  His death was communicated over the

MPD radio dispatch shortly thereafter.  Id. ¶ 82.  Vue's mother Yang was on the first floor of the

house during the entire incident and was later taken to the hospital for chest pain and lacerations

to her arm.  Id. ¶¶ 86-88.

During and after the incident, the Children repeatedly asked to be let out of the squad

cars, but the Officers refused and told them to stop asking.  Id. ¶¶ 103-158.  The Children were

placed in separate squad cars and transported them to MPD headquarters to be interviewed.  Id.

¶¶ 105-107, 144, 158, 159.

Upon arriving at MPD headquarters, the Children were searched, their phones were taken

from them, and they were required to wait alone in separate, locked interview rooms for nearly

six hours.  Id. ¶¶ 159-165, 179-80, 184, 191, 207.  During this time, they did not know whether

their father had survived or the condition of their grandmother.  Id. ¶¶ 144, 152, 164,169-70, 182,

192, 199.

After waiting hours to be interviewed, the Children were questioned separately by BCA investigators for about seven minutes.  Id. ¶¶ 170, 186, 194, 206.  At approximately 10:00 a.m., they were transported by MPD patrol vehicles to a family member's home in Brooklyn Center. Id. ¶ 208.

Plaintiffs filed this 14-count action alleging that Defendants violated their First, Fourth, and Fourteenth Amendment rights while acting under the color of state law, in violation of 42 U.S.C. § 1983.  Plaintiffs also allege state law causes of action including wrongful death, false imprisonment, intentional and negligent infliction of emotional distress, and negligence.

Defendants move for partial judgment on the pleadings.  Defendants seek dismissal of all claims except for the Children's unlawful seizure claim and Nou and Hailee's and excessive force claims in Count III, and the Children's unlawful seizure of property claims in Count IV. Mot. at 2.

## III.  DISCUSSION

### A.  Judgment on the Pleadings Standard

Defendants move to dismiss under Rule 12(c) of the Federal Rules of Civil Procedure, which provides that "[a]fter the pleadings are closed . . . a party may move for judgment on the pleadings."  In considering a motion for judgment on the pleadings under Rule 12(c), the court views "all facts pleaded by the nonmoving party as true and grant[s] all reasonable inferences in favor of that party."  Poehl v. Countrywide Home Loans, Inc., 528 F.3d 1093, 1096 (8th Cir. 2008).  Judgment on the pleadings is appropriate "where no material issue of fact remains to be resolved and the movant is entitled to judgment as a matter of law."  Faibisch v. Univ. of Minn., 304 F.3d 797, 803 (8th Cir. 2002).  This is the same standard used to resolve a motion to dismiss under Rule 12(b)(6).  Ashley Cnty., Ark. v. Pfizer, Inc., 552 F.3d 659, 665 (8th Cir. 2009).

5

To survive Rule 12 scrutiny, a plaintiff's factual allegations must "raise a right to relief above the speculative level," and push claims "across the line from conceivable to plausible." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 570 (2007). In other words, the complaint must establish more than a "sheer possibility that a defendant has acted unlawfully." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). A pleading must relate "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw a reasonable inference that the defendant is liable for the misconduct alleged." Iqbal, 556 U.S. at 678. Conversely, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief." Id. (quoting Twombly, 550 U.S. at 557).

When considering whether to grant a motion for judgment on the pleadings, "the court generally must ignore materials outside the pleadings, but it may consider some materials that are part of the public record or do not contradict the complaint, as well as materials that are necessarily embraced by the pleadings. Porous Media Corp. v. Pall Corp., 186 F.3d 1077, 1079 (8th Cir. 1999) (internal quotation marks and citations omitted). Materials embraced by the pleadings include "documents whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the pleading." Kushner v. Beverly Enterprises, Inc., 317 F.3d 820, 831 (8th Cir. 2003).[4]

---

[4] Defendants ask the Court to consider the body-worn camera ("BWC") footage from the incident because the BWC recordings are public records and embraced by the pleadings, and the recordings document in real time the sequence of events as they occurred that night. Plaintiffs argue that the Court should not consider the footage because "it is incomprehensible, fails to identify the individuals depicted visually or audibly, and uses inconsistent time-stamps." Pl. Mem. Opp'n Summ. J. [Docket No. 54] at 6. At this stage, the Court does not rely upon the BWC footage.

**B. Federal Claims**

"Section 1983 imposes liability for certain actions taken 'under color of state law that deprive a person of a right secured by the Constitution and laws of the United States.'" <u>Dossett v. First State Bank</u>, 399 F.3d 940, 947 (8th Cir. 2005), (quoting <u>Lugar v. Edmondson Oil Co.</u>, 457 U.S. 922, 931 (1982)).

Qualified immunity shields government officials from § 1983 lawsuits and liability "unless the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." <u>LaCross v. City of Duluth</u>, 713 F.3d 1155, 1157 (8th Cir. 2013). "To overcome qualified immunity at the pleadings stage, a plaintiff must plead facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct.'" <u>Partridge v. City of Benton, Arkansas</u>, 929 F.3d 562, 565 (8th Cir. 2019) (internal quotation marks and alterations omitted).

**1. Excessive Force (Count I)**

Plaintiffs allege that eleven of the Officers used excessive force against Vue and Yang in violation of the Fourth Amendment.[5] Defendants argue they are entitled to qualified immunity because the force used was objectively reasonable.

Excessive force claims are analyzed under the Fourth Amendment's "objective reasonableness" standard. <u>Graham v. Connor</u>, 490 U.S. 386, 388 (1989). "[T]he question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." <u>Id.</u> at 397. A court "must consider the totality of the circumstances, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officer or others, and whether

---

[5] Plaintiffs agree to dismiss the excessive force claim brought by Vue's wife Mai Pha Vue on her own behalf. Pl. Mem. Opp'n Summ. J. at 12 n.2.

the suspect is actively fleeing or resisting arrest." Loch v. City of Litchfield, 689 F.3d 961, 965 (8th Cir. 2012) (citing Graham, 490 U.S. at 396).

"It is reasonable for an officer to use deadly force if he has probable cause to believe that a suspect poses a threat of serious physical harm to the officer or others." Partridge v. City of Benton, Arkansas, 929 F.3d 562, 565 (8th Cir. 2019). When feasible, an officer should give "some warning" before using deadly force. Loch, 689 F.3d at 967. The reasonableness of an officer's use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396.

Accepting all facts in the Complaint as true and drawing all reasonable inferences in favor of Plaintiffs, the Officers' use of deadly force on Vue was objectively reasonable under the circumstances. The Officers on the scene learned that Vue had discharged his firearm inside the family home, causing his children to flee and call 911 from a nearby vehicle. Their wheelchair-bound grandmother was still in the house. Approximately half an hour after the Officers had arrived and surrounded the house, Vue came to the front porch door unarmed and saw the Officers running towards him and pointing their guns at him. Vue went back inside and emerged from the house two minutes later with a rifle, prompting an Officer to yell, "He's got a gun! He's got a rifle!" Because Vue returned to the front porch with a rifle after seeing the Officers in his yard, a reasonable officer on the scene would have probable cause to believe that Vue posed an immediate threat of serious physical harm to the Officers or others.

Plaintiffs argue that the shooting of Vue was objectively unreasonable because the Eighth Circuit has held that "[g]enerally, an individual's mere possession of a firearm is not enough for an officer to have probable cause to believe that individual poses an immediate threat of death or serious bodily injury; the suspect must also point the firearm at another individual or take similar 'menacing action.'" Cole ex rel. Est. of Richards v. Hutchins, 959 F.3d 1127, 1132 (8th Cir.

2020).  Here, Vue did take menacing action---he escalated the situation after seeing the Officers by retrieving a rifle from the house and coming back outside, now armed.  The Officers were not required to wait until Vue pointed his rifle before they fired their guns.  "In dangerous situations where an officer has reasonable grounds to believe that there is an imminent threat of serious harm, the officer may be justified in using a firearm before a subject actually points a weapon at the officer or others."  Liggins v. Cohen, 971 F.3d 798, 801 (8th Cir. 2020); see also Sinclair v. City of Des Moines, Iowa, 268 F.3d 594, 596 (8th Cir. 2001) ("[N]o constitutional or statutory right exists that would prohibit a police officer from using deadly force when faced with an apparently loaded weapon.").

The Eighth Circuit has stated that in circumstances involving a person with a weapon, "[w]here the weapon was, what type of weapon it was, and what was happening with the weapon are all inquiries crucial to the reasonableness determination."  Partridge, 929 F.3d at 566–67 (quoting Perez v. Suszczynski, 809 F.3d 1213, 1220 (11th Cir. 2016)).  Here, the weapon was being held by Vue on the front porch, it was a rifle, and it had been brought outside by Vue two minutes after Vue had seen the police in front of his house with their guns pointed at him.  These circumstances would lead a reasonable officer to believe that Vue posed an immediate threat of death or serious bodily injury.  See Sinclair, 268 F.3d at 596 (holding use of deadly force was reasonable where officers searching for an assault suspect knocked on an apartment door and announced their presence, and the door opened revealing a man holding a long barrel rifle).

The cases cited by Plaintiff do not compel a different conclusion.  In Partridge v. City of Benton, Arkansas, the plaintiff alleged that officers acted unreasonably in shooting a suicidal teenager who had been holding a gun to his temple and was moving the gun away from his head in response to the officers' orders to drop the gun when officers shot him.  929 F.3d at 564-65. The Eighth Circuit held that based on the facts pleaded and the reasonable inferences, a

reasonable officer would have known that the teenager was moving his gun in compliance with commands to drop the gun, and that shooting him under such circumstances would constitute excessive force, even though he was armed.  Id. at 566.  Unlike the complaint in Partridge, the Complaint here does not allege that Vue was attempting to comply with the Officers' orders when he was shot.  Additionally, the plaintiff in Partridge was already in possession of a gun when the officers arrived.  Here, Vue chose to arm himself with a rifle in response to observing the Officers in his yard.

In Cole ex rel. Est. of Richards v. Hutchins, the decedent had a gun and was initially chasing another man, but the man ran into his house and the decedent was walking away from the house "with his gun pointed either toward the ground or sky" when the officer shot him.  959 F.3d at 1133.  The officer allegedly did not give a warning prior to shooting.  Id.  The Eighth Circuit concluded that a jury could find that the deadly force was not justified because the decedent was not wielding the weapon in a threatening manner, the immediate threat to the man being chased had passed, and the officer "chose to stand silent" before shooting.  Id.

In contrast to the circumstances in Hutchins, there is no factual content in the Complaint that allows for a reasonable inference that Vue was retreating or that he was acting in a non-threatening manner when he returned to his front porch with a rifle.  Although the Complaint alleges that "no shots [were] . . . threatened to be discharged by . . . Vue" until the Officers fired their weapons, Compl. ¶ 59, no factual allegations support the conclusory allegation that Vue was not threatening to shoot his rifle.  Vue's conduct in bringing the gun outside after seeing the Officers would give a reasonable officer on the scene probable cause to believe that Vue was threatening to use the gun on them.  Indeed, although it is uncertain who shot first, it is significant that Vue shot his rifle six times from the porch during the barrage of shots that were near simultaneously fired.  Id. ¶¶ 78-79, 216.

The Complaint does not allege whether Officers gave a warning to Vue before shooting, but Vue would have been on notice from their raised guns that his escalation of the situation would result in the Officers using their firearms.  See Estate of Morgan v. Cook, 686 F.3d 494, 498 (8th Cir. 2012) (holding officer's use of deadly force was objectively reasonable where the suspect "should have been on notice" from officer's raising his gun and ordering the suspect to put down a knife that the suspect's "escalation of the situation would result in the use of the firearm").

Plaintiffs allege that the force was unreasonable because the Officers "created an unnecessary and heightened danger" to Vue by using a Hmong-speaking officer to communicate with Vue instead of waiting for a trained negotiator to arrive, and by encouraging Vue to come outside where dozens of officers with firearms were waiting without any coordinated plan for engaging with Vue.  Compl. ¶¶ 213-215, 218, 220.  However, whether an officer's actions may have created the need to use deadly force is not relevant to whether the officer's use of force was reasonable.  Schulz v. Long, 44 F.3d 643, 649 (8th Cir. 1995).  As the Eighth Circuit has explained:

> The Fourth Amendment inquiry focuses not on what the most prudent course of action may have been or whether there were other alternatives available, but instead whether the seizure actually effectuated falls within a range of conduct which is objectively "reasonable" under the Fourth Amendment.  Alternative measures which 20/20 hindsight reveal to be less intrusive (or more prudent), such as waiting for a supervisor or the SWAT team, are simply not relevant to the reasonableness inquiry.  For clarity, the reasonableness inquiry in cases such as this where deadly force is used is simply whether "the officer [using the force] has probable cause to believe that the suspect poses a significant threat of death or serious physical injury to the officer or others."

Id. (quoting Tennessee v. Garner, 471 U.S. 1, 3 (1985)).

The claim that excessive force was used on Yang also fails.  Plaintiffs argue that Yang was inside the house when Vue was shot, and that the force used against her, a bystander, was unreasonable for the same reasons that the use of deadly force against Vue was unreasonable.

11

This argument fails because "the Fourth Amendment addresses misuse of power, not the accidental effects of otherwise lawful government conduct." Gardner v. Bd. of Police Comm'rs, for Kansas City, Mo., 641 F.3d 947, 951 (8th Cir. 2011) (quoting Brower v. Cnty. of Inyo, 489 U.S. 593, 596 (1989)). The use of deadly force against Vue was lawful, and the accidental effects on Yang from the officers' shots do not constitute a Fourth Amendment violation.

Plaintiffs argue that dismissal at the pleading stage is improper because factual disputes exist surrounding the shooting that have not yet had the benefit of discovery. However, the Complaint has not alleged any facts that would allow the Court to infer that Defendants acted unreasonably in using deadly force. See Fields v. Tucker, No. 10CV844, 2011 WL 4345306, at *6 (M.D.N.C. Sept. 15, 2011) (dismissing excessive force claim for failure to state a claim where plaintiff did not allege sufficient facts regarding each parties' actions that would allow court to infer that defendant acted objectively unreasonably). As such, the Complaint "stops short of the line between possibility and plausibility of entitlement to relief." Twombly, 550 U.S. at 557. Because Plaintiffs have not alleged facts giving rise to a reasonable inference that the Officers violated Vue and Yang's Fourth Amendment rights, the Officers are entitled to qualified immunity on their excessive force claim. Accordingly, Count I is dismissed.

### 2. Equal Protection (Count II)

Plaintiffs allege that eleven of the Officers violated Vue, Yang, and Mai Pha Vue's Fourteenth Amendment right to equal protection. The Equal Protection Clause provides that no State shall "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1. This mandate has been interpreted to require state actors "to treat similarly situated people alike." Rouse v. Benson, 193 F.3d 936, 942 (8th Cir. 1999) (quoting City of Cleburne v. Cleburne Living Ctr., Inc., 473 U.S. 432, 439 (1985)). To establish a violation of the Equal Protection clause, a plaintiff must show that they have been treated

12

differently by a state actor than others who are similarly situated simply because they belong to a particular protected class. Keevan v. Smith, 100 F.3d 644, 648 (8th Cir. 1996).

Plaintiffs allege that the Officers treated Vue differently based on his race than similarly situated people. According to the Complaint, if Vue had not been Asian or Hmong, the Officers would have followed Operation 100 protocol and provided him with a qualified and trained negotiator rather than having Officer Moua, a patrol officer with five years of experience, initiate negotiations with Vue. Officer Moua's only qualification for being selected to negotiate with Vue was his ability to speak Hmong, the same language as Vue. The Complaint alleges that "[o]ther similarly situated individuals who are not Hmong, not Asian, and/or speak English, would never have had an unqualified individual, such as Defendant Moua, leading and initiating a critical incident negotiation." Compl. ¶ 236.

In alleging that Vue was treated differently than similarly situated individuals, the Complaint cites to two prior instances where Operation 100 was initiated and a qualified negotiator was used in response to a barricaded suspect. The first incident, occurring in 2015, involved an English-speaking man who was not Hmong or Asian and was threatening to kill his three-year-old daughter. MPD SWAT negotiators safely negotiated for four hours with the father before taking him peacefully into custody. The second incident occurred just two weeks before Vue's shooting and involved an English-speaking individual who was not Hmong or Asian and was barricaded inside a residence with another person. Gunfire was heard inside the residence after MPD officers arrived. SWAT personnel and negotiators made numerous attempts to contact the people inside the residence and waited for four hours before deploying a robot into the home. The robot identified two deceased bodies inside the residence.

These factual allegations do not give rise to a plausible inference that Vue was treated differently than similarly situated individuals, much less that any dissimilar treatment was

racially motivated.  Here, Defendants did not deny Vue an interpreter---one was requested in conformance with Operation 100 and arrived on the scene approximately 30 minutes after Operation 100 was activated.  Compl. ¶¶ 54, 57-58.  Additionally, there are no facts from which to infer that if a similarly situated English-speaking, non-Hmong individual had been barricaded in the home, an English-speaking officer would not have initiated negotiations during the half hour interval before the negotiator arrived.  The Officers knew that Vue had discharged his gun in the house minutes earlier while his family was present, and that Vue's mother was still inside the house with her armed son.  Plaintiffs have not cited to any provision of the Operation 100 policy that required on-the-scene officers to stand idly by during this tense and uncertain situation while they awaited the arrival of the SWAT team.

Additionally, although the Complaint alleges that negotiators were present during the two prior incidents involving barricaded individuals, the Complaint is silent about whether the on-scene officers had attempted to make contact with the individuals before the negotiators arrived.[6] Thus, the facts alleged do not give rise to an inference that Vue was treated differently from similarly situated individuals.

Even if it could be assumed that the on-scene officers in the prior two incidents did not initiate contact with the barricaded individual before a trained negotiator arrived, this approach failed to prevent the loss of life in the second incident, which occurred just two weeks prior to Vue's death.  In that incident, not only did the armed individual die, another person in the barricaded residence also died.  It is purely speculative to conclude that the loss of life would have been prevented had Officer Moua not communicated with Vue.

---

[6] The Complaint includes internet citations to Facebook articles describing the incidents.  See Compl. ¶ 233 n.2, ¶ 234 n.3.  The citations are no longer active and lead to a message stating, "This page isn't available."  Accordingly, the Court has not read the Facebook articles referenced in the Complaint and relies solely on the factual allegations describing the incidents.

In addition to being factually deficient, Plaintiffs' Equal Protection claim lacks relevant legal precedent.  Plaintiffs attempt to support their claim with cases involving the selective enforcement of traffic laws based on race.  See Pl. Mem. Opp'n Mot. Dismiss at 18-19 (citing Johnson v. Crooks, 326 F.3d 995, 999-1000 (8th Cir. 2003); Parada v. Anoka Cnty., 332 F. Supp. 3d 1229, 1244 (D. Minn. 2018)).  These cases are not sufficiently analogous because they involve the enforcement of laws, not departmental policies.

The selective enforcement cases are also distinguishable because they concern an officer's discretion in enforcing clearly delineated traffic laws, rather than an officer's discretion in responding to the unpredictable and volatile hostile scenarios created by an active shooter possibly with a hostage.  Allowing an Equal Protection claim to proceed in this context would require a court to engage in the type of "Monday morning quarterbacking" of police conduct during uncertain and rapidly evolving circumstances that should not be judged with 20/20 hindsight.  Cf. Schulz, 44 F.3d at 649 (holding in Fourth Amendment case that officers' actions in tense and evolving circumstances were reasonable, even if the actions were not the most prudent in hindsight).

Because the Complaint fails to allege a plausible Equal Protection claim, Count II is dismissed.

### 3. Unlawful Seizure and Excessive Force (Count III)

The Children allege in Count III that eleven Officers violated their Fourth Amendment rights to be free from excessive force and unlawful seizure when the Officers forcibly detained them in locked squad cars at the scene and later transported them to locked rooms at MPD headquarters.

With respect to Chamee and Benjamin's excessive force claims, there are no allegations that officers used physical force or ever threatened them with force.  Rather, Plaintiffs merely

15

allege that Chamee and Benjamin were prevented from leaving the squad cars. Where a police officer detains a person without reasonable suspicion but uses no more force than would have been reasonably necessary if the detention were warranted, the plaintiff has a claim for unlawful detention but not an additional claim for excessive force. Cortez v. McCauley, 478 F.3d 1108, 1126 (10th Cir. 2007). As there are no allegations that officers used any force on Chamee and Benjamin, their claims for excessive force are dismissed.

The Court next considers the Children's unlawful seizure claims. To plead a plausible claim for a Fourth Amendment violation, a plaintiff must allege facts which demonstrate that a seizure occurred and the seizure was unreasonable. Davis v. Dawson, 33 F.4th 993, 997 (8th Cir. 2022). The reasonableness of a seizure is assessed by balancing "the magnitude of the intrusion against the importance of the government interests." Seymour v. City of Des Moines, 519 F.3d 790, 798 (8th Cir. 2008).

Plaintiffs allege that the Officers locked them in squad cars and denied their requests to leave the squad cars, even after any purported danger had passed, and then transported them to locked and separate rooms at MPD headquarters. Compl. ¶¶ 89-208. The Children allege that they could not leave to be with their father and grandmother at the hospital, even though they were not suspects in any crime. The Children were detained for up to six hours and were then interviewed for approximately seven minutes. These allegations are more than sufficient to demonstrate that the nature and length of the seizures exceeded the bounds of reasonableness. See Davis, 33 F.4th at 996-99 (holding that detaining family members of stabbing victim against their will without probable cause for more than three hours while the stabbing victim died at the hospital was an unreasonable seizure in violation of the Fourth Amendment). Additionally, it has been clearly established that a person cannot be detained for a prolonged period merely due to their presence at a crime scene. See Seymour, 519 F.3d at 797-98 (holding that detaining

father without reasonable suspicion for 45 minutes and preventing him from going to hospital where his unresponsive child was hospitalized violated the father's right to be free from unreasonable seizures).

Defendants argue that it was objectively reasonable to place the Children in the squad cars to keep them safe given the circumstances of their father's shooting, and in consideration of it being a very early sub-zero temperature morning.  Further, they sought to gather information about Vue during the standoff.  Defendants thus contend that the Officers who placed the Children in their squads until the scene was secure are entitled to qualified immunity because it is not clearly established that officers may not detain a non-suspect witness to gather information about an armed suspect during a standoff.  Defendants do not seek dismissal of the children's seizure claims relating to their detention after the scene was secure.

Assuming without deciding that the Children's detention in the squad cars was initially reasonable, the Court lacks a sufficient factual basis at this early stage in the case for determining when the seizure became unreasonable.  Discovery of the full set of facts surrounding to understand the context surrounding the seizures and the extent of each Officers' involvement is required before the Court can ascertain which Officers, if any, are entitled to qualified immunity. Accordingly, Defendants' motion to dismiss a portion of the Children's unlawful seizure claims is denied.

### 4. First Amendment (Count V)

Plaintiffs Hailee and Nou assert a First Amendment claim against two Officers for allegedly violating their right to free speech and expression.  The Complaint alleges that Hailee and Nou requested many times to be released from their unlawful detention and were repeatedly denied and told to "stop asking."  Compl. ¶ 255.

These allegations fail to give rise to a plausible First Amendment claim. Arresting officers do not violate an arrestee's First Amendment rights by telling them to "shut up." See Ingram v. Sacramento Police Dep't, No. CIVS082547, 2009 WL 2905774, at *5 (E.D. Cal. Sept. 4, 2009), report and recommendation adopted (Sept. 30, 2009) (holding that allegations that an officer "aggressively forc[ed] Plaintiff to shut up or else" and "refus[ed] to let Plaintiff express his self" did not state a plausible claim for a First Amendment violation). Count V is therefore dismissed.

### 5. Conspiracy to Violate Civil Rights (Count VI)

The Children assert a claim of conspiracy to violate civil rights against eleven Officers. The claim is based on an alleged conspiracy between the Officers and the BCA investigators to unlawfully detain the children in patrol cars and at MPD headquarters without probable cause or reasonable suspicion, and to unlawfully search them and seize their property without probable cause or reasonable suspicion. Plaintiffs allege the unlawful detention, search, and seizure of property were in furtherance of MPD and BCA's investigation.

To plead a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) that the defendants conspired with others to deprive him of constitutional rights; (2) that at least one of the alleged co-conspirators engaged in an overt act in furtherance of the conspiracy; and (3) that the overt act injured him." Holmes v. Slay, 895 F.3d 993, 1001 (8th Cir. 2018) (quoting Bonenberger v. St. Louis. Metro. Police Dep't, 810 F.3d 1103, 1109 (8th Cir. 2016). The plaintiff must also show a violation of their constitutional rights. White v. McKinley, 519 F.3d 806, 814 (8th Cir. 2008). A claim for conspiracy "must be pleaded with sufficient specificity and factual support to suggest a meeting of the minds directed toward an unconstitutional action." Nelson v. City of McGehee, 876 F.2d 56, 59 (8th Cir. 1989) (internal quotations omitted).

Plaintiffs have alleged sufficient facts and specificity to suggest that the Officers and the BCA conspired to deprive the Children of their Fourth Amendment rights by unlawfully detaining them, searching them, and seizing their property without probable cause or reasonable suspicion. The Complaint alleges that the Officers repeatedly told the Children that they were being detained in the squad cars and transported to MPD headquarters because unnamed individuals and investigators needed to interview them. Compl. ¶¶ 141, 149-150, 153. After arriving at MDP headquarters, the Children were searched and their phones, keys, and wallets were taken from them. They were then held separately in locked rooms for several hours before being interviewed by a BCA representative for approximately seven minutes. Compl. ¶¶ 164-74, 182-86, 191-95, 197-206. After BCA investigators James Reyerson ("Reyerson") and Scott Mueller ("Mueller") had completed their questioning of Nou, an unidentified MPD officer asked Reyerson and Mueller if Chamee could be allowed with Benjamin during his interview. Mueller denied the request and ordered that Chamee and Benjamin continue to be separated and detained because he did not want Benjamin to speak to her. Id. ¶ 207.

These factual allegations are sufficient at this juncture to suggest a meeting of the minds between the Officers and the BCA to unconstitutionally detain the Children without reasonable suspicion or probable cause in violation of their Fourth Amendment rights. Accordingly, Defendants' motion to dismiss Count VI is denied.

### 6. Municipal Liability (Counts VII and VIII)

Defendants seek dismissal of Counts VII and VIII of the Complaint, arguing that Plaintiffs fail to sufficiently allege municipal liability under § 1983. A municipality cannot be held vicariously liable under § 1983 for the unconstitutional acts of its employees. Bolderson v. City of Wentzville, 840 F.3d 982, 985 (8th Cir. 2016). Rather, a municipal liability will be subject to liability for a constitutional violation only if the violation resulted from a municipal

policy, an unofficial municipal custom, or the inadequate training or supervision of an employee. Id.; Monell v. Dep't of Soc. Servs. of City of New York, 436 U.S. 658, 694 (1978) (policy or custom); City of Canton v. Harris, 489 U.S. 378, 388, 109 (1989) (training or supervision).

Plaintiffs assert a Monell claim against the City based on allegations that the City has a de facto policy, custom, and practice of condoning, ratifying, failing to discipline, and failing to investigate personnel who: (1) use excessive force against individuals by shooting them with lethal or less lethal munitions absent probable cause in violation of the Fourth Amendment; (2) unlawfully detain persons without reasonable suspicion despite requests for release in violation of the Fourth Amendment; (3) discriminate against individuals in violation of their Fourteenth Amendment rights; and (4) retaliate against individuals for exercising their First Amendment rights.  Compl. ¶ 270.

Plaintiffs' allegations fail to state a plausible Monell claim based on a de facto policy or custom.  "To trigger municipal liability based on unofficial municipal custom, the custom must be so pervasive among non-policymaking employees of the municipality that it effectively has the force of law."  Bolderson, 840 F.3d at 986 (citing Ware v. Jackson Cnty., Mo., 150 F.3d 873, 880 (8th Cir. 1998)).  Alleging a single instance of misconduct is not sufficient to support an inference of a custom or unofficial policy of the City.  Doe ex rel. Doe v. Sch. Dist. of City of Norfolk, 340 F.3d 605, 614 (8th Cir. 2003).

Here, Plaintiffs have alleged no specific facts pertaining to other instances of misconduct to support a custom.  Rather, the Complaint merely offers "labels and conclusions" and a "formulaic recitation of the elements of a cause of action."  Twombly, 550 U.S. at 556-67. Because Plaintiffs' allegations of an unconstitutional City custom are entirely conclusory, the Monell claim fails.

Similarly, Plaintiffs' <u>Canton</u> claim for inadequate training or supervision must be dismissed for failure to allege specific facts to support the claim.  To state a claim for municipal liability under <u>Canton</u>, a plaintiff must plead facts showing that "the city 'had notice that its procedures were inadequate and likely to result in a violation of constitutional rights.'"  <u>Id.</u> at 1076 (quoting <u>Thelma D. By & Through Delores A. v. Bd. of Educ. of City of St. Louis</u>, 934 F.2d 929, 934 (8th Cir. 1991)).

Plaintiffs allege that the City failed to properly train, supervise, discipline, or correct practices of excessive force, unlawful detention, unlawful retaliation, and discrimination. Compl. ¶ 277.  Plaintiffs further allege that the City failed to train MPD officers "as to the legal requirements and protections applicable to persons as set forth in the United States and Minnesota constitutions or other laws."  <u>Id.</u>  The Complaint offers no specific facts pertaining to prior instances of a failure to train or discipline that would show the City had notice that its training and supervision were inadequate and likely to result in constitutional violations. Because the allegations are wholly conclusory, the <u>Canton</u> claim fails.

Even if Plaintiffs had plausibly alleged the existence of a custom and a failure to supervise or train, municipal liability will only attach if individual liability is found on an underlying substantive claim.  <u>Brockinton v. City of Sherwood, Ark.</u>, 503 F.3d 667, 674 (8th Cir. 2007).  As discussed earlier, Plaintiffs have failed to plausibly allege that the Officers engaged in unconstitutional conduct with respect to any of the underlying federal claims with the exception of the Children's unlawful detention claim.  Thus, had Plaintiffs alleged sufficient factual content to show a custom under <u>Monell</u> or a failure to supervise or train under <u>Canton</u>, any municipal liability would be limited to the Children's unlawful detention claim.

Because Plaintiffs have failed to allege facts supporting their <u>Monell</u> and <u>Canton</u> claims, Counts VII and VIII are dismissed.

### C.  State Law Claims

Defendants move to dismiss Plaintiffs' state law claims, arguing the Officers are entitled to official immunity because their actions were discretionary and the Officers did not act with malice.  Plaintiffs respond that the Officers are not entitled to official immunity because their actions in failing to abide by MPD's policies and procedures were ministerial rather than discretionary.  Plaintiffs also argue that even if the Officers' actions were discretionary, they are not entitled to official immunity because they acted with malice.

"[U]nder Minnesota law, a public official is entitled to official immunity from state law claims when that official is charged by law with duties that require the exercise of judgment or discretion."  Johnson v. Morris, 453 N.W.2d 31, 41 (Minn. 1990).  Discretionary duties require the use of "professional judgment to choose between a variety of options under uncertain circumstances and without the benefit of time for reflection."  Welters v. Minnesota Dep't of Corr., 968 N.W.2d 569, 586 (Minn. Ct. App. 2021).  In contrast, ministerial duties are absolute and certain, and involve executing a "specific duty arising from fixed and designated facts."  Id.

Generally, law enforcement officers are classified as discretionary officers who may be entitled to official immunity.  Nelson v. Cnty. of Wright, 162 F.3d 986, 991 (8th Cir. 1998) (citing Johnson, 453 N.W.2d at 42).  However, if a mandatory government policy sets a narrow and definite standard of conduct on an officer facing a particular set of circumstances, the policy renders the officer's duty under that policy ministerial.  Mumm v. Mornson, 708 N.W.2d 475, 491 (Minn. 2006).  When an officer has a ministerial duty to engage in certain conduct under such a policy and fails to do so, the officer's actions are not protected by official immunity.  Id.

When a public official's conduct is discretionary, the conduct is not immune from liability if the official "is guilty of a wilful or malicious wrong."  Rico v. State, 472 N.W.2d 100, 107 (Minn. 1991).  "Malice is 'the intentional doing of a wrongful act without legal justification

or excuse, or, otherwise stated, the willful violation of a known right.'" <u>Samuelson v. City of New Ulm</u>, 455 F.3d 871, 878 (8th Cir. 2006) (quoting <u>Carnes v. St. Paul Union Stockyards Co.</u>, 205 N.W. 630, 631 (Minn. 1925)).  The "willful or malicious wrong" exception to official immunity "anticipates liability only when an official intentionally commits an act that he or she has reason to believe is prohibited." <u>Johnson v. Cnty. of Dakota</u>, 510 N.W.2d 237, 240–41 (Minn. Ct. App. 1994) (quoting <u>Rico</u>, 472 N.W.2d at 107).

### 1. Wrongful Death (Count X)

Defendants move to dismiss the wrongful death claim in Count X.  They argue that the officers are entitled to official immunity because their actions when Vue came out of the house were discretionary, and there are no factual allegations to suggest that officers acted with malice when they shot Vue.

The Court agrees.  "[T]he conduct of police officers in responding to a dispatch or making an arrest involves precisely the type of discretionary decisions, often split-second and on meager information, that we intended to protect from judicial second-guessing through the doctrine of official immunity." <u>Kelly v. City of Minneapolis</u>, 598 N.W.2d 657, 665 (Minn. 1999).  The Officers here were exercising discretion in responding to a situation involving an armed, barricaded individual with a potential hostage.  Additionally, for the reasons discussed above, the Officers acted with legal justification, and so the "willful or malicious wrong" exception does not apply.

Plaintiffs argue that the Officers' conduct was ministerial because they allegedly failed to abide by MPD policies, including its Operation 100 policy.  However, Operation 100 does not set a narrow and definite standard of conduct in on an officer facing a particular set of circumstances.  As such, Operation 100 did not render the Officers' conduct ministerial. Accordingly, Count X is dismissed.

**2. False Imprisonment (Count XI)**

Defendants argue that the Officers who placed the Children in their squad cars until the scene was secured are entitled to official immunity. Defendants contend that deciding where to safely place the Children until the scene was secure required discretion in uncertain circumstances.

As discussed above, Plaintiffs have alleged facts showing that the nature and duration of the Children's detention in the squad cars and at MPD was objectively unreasonable and violated their Fourth Amendment rights. Additionally, the Officers would have had reason to believe that their conduct in seizing the Children without probable cause and transporting to MPD headquarters against their will was prohibited. See Davis, 33 F.4th at 999 (holding that there is a "robust consensus" that seizing witnesses to a crime or a police shooting without probable cause is a clearly established constitutional violation). Because these allegations establish a willful violation of a known right, the Officers are not entitled to official immunity at this stage of the case.

To the extent that the Children's detention in the squad cars was initially lawful, the Court lacks a sufficient factual basis at this early stage in the case for determining when the seizure became unconstitutional. Discovery of the full set of facts surrounding the seizures and the extent of each Officers' involvement is required before the Court can ascertain which Officers, if any, are entitled to official immunity. As a result, Defendants' motion for partial dismissal of the false imprisonment claims in Count XI is denied.

### 3.  Intentional Infliction of Emotional Distress (Count XII)

All Plaintiffs assert a claim of intentional infliction of emotional distress against all Defendants except Sergeant Carlson and Officer Lynch.[7]  The claim of intentional infliction of emotional distress "is sharply limited to cases involving particularly egregious facts."  Hubbard v. United Press Int'l, Inc., 330 N.W.2d 428, 439 (Minn. 1983).  To state a claim for intentional infliction of emotional distress, a plaintiff must allege facts showing:  "(1) the conduct must be extreme and outrageous; (2) the conduct must be intentional or reckless; (3) it must cause emotional distress; and (4) the distress must be severe."  McDonald v. City of Saint Paul, 679 F.3d 698, 708 (8th Cir. 2012) (quoting Langeslag v. KYMN Inc., 664 N.W.2d 860, 864 (Minn. 2003)).  "Conduct is extreme and outrageous when it is so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  Langeslag, 664 N.W.2d at 865.

Plaintiffs' claim for intentional infliction of emotional distress is based on the following conduct:  using an unqualified and inexperienced Officer to negotiate with Vue; subjecting Plaintiffs to visually witnessing and hearing Vue be shot by the Officers and to seeing his body be removed from the porch and carried to the ambulance; subjecting Yang to multiple shots and witnessing the shooting of her son, Vue; locking the Children in unheated patrol vehicles despite their repeated pleas to be released; preventing the Children from being with their father at the

---

[7]  Defendants initially argued that seven of the Officers had not been served within the two-year statute of limitations in Minn. Stat. § 541.07, subd. 1, which applies to claims for intentional infliction of emotional distress.  In response, Plaintiffs provided an affidavit stating that five of the Officers were timely served under Minn. R. Civ. P. 3.01(c) by delivering the summons to the sheriff.  See Goldenberg Aff. [Docket No. 54, Attach. 2].  Plaintiffs concede that Sergeant Carlson and Officer Lynch were not served within the two-year statute of limitations, and withdraw their emotional distress claims as to those two Defendants.  See Pl. Mem. Opp'n Mot. Dismiss at 41-42.  Accordingly, the claim of emotional distress in Count XII is dismissed as to Sergeant Carlson and Officer Lynch.

hospital during the last minutes of his life; intentionally misrepresenting and withholding the fact of Vue's death; and detaining the Children for over six hours.  Compl. ¶ 299(a)-(j).

For the reasons discussed earlier, the Officers' conduct in negotiating with Vue and using deadly force was discretionary and was not malicious.  Accordingly, the Officers are entitled to official immunity as to their conduct related to the shooting of Vue and the Children's witnessing and hearing the shooting.

The Officers are not entitled to official immunity for their conduct in detaining the Children in squad cars and at MPD headquarters for over six hours.  The Officers knew that the Children were not suspected of any crime, yet after their father's shooting the Officers separated the Children from each other, drove them to MPD headquarters over their protestations, searched them and took their phones and wallets, and forced them to wait alone in locked rooms for hours without knowing the fate of their father and with no ability to seek comfort from family after a tragic and traumatic family crisis.  These allegations of unjustified use of police power have the potential to show conduct that is "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community."  Langeslag, 664 N.W.2d at 865.

Defendants argue that the Officers who placed the Children in their squads until the scene was secured are entitled to official immunity.  However, discovery of the facts surrounding the seizures and the extent of each Officers' involvement is required before the Court can ascertain which Officers, if any, are entitled to official immunity.

Accordingly, Count XII is dismissed as to all conduct except the Children's detention described in ¶ 299(d),(h),(i), and (j) of the Complaint.

### 4.  Negligent Infliction of Emotional Distress (Count XIII)

Defendants argue they are entitled to official immunity on Yang's claim for negligent infliction of emotional distress.  The claim is based on Yang's having to witness her son get shot and killed while trying to protect herself from the bullets that entered her home.

The Officers are entitled to official immunity on this claim because, as discussed above, the Officers were exercising discretion when they fired at Vue, and they acted with legal justification and without malice.  Accordingly, Count XIII is dismissed.

### 5.  Negligence (Count XIV)

All Plaintiffs assert a claim for negligence against all Defendants.  The negligence claim is based on all the acts and omissions complained of throughout the Complaint.  Defendants argue they are entitled to official immunity from the negligence claim.

Except for the Officers' conduct in detaining the Children in squad cars and at MPD headquarters, the Officers' actions were discretionary and were carried out without malice.  Accordingly, Count XIV is dismissed as to all conduct except the Children's detention.

### 6.  Vicarious Liability (Count IX)

Plaintiffs assert a claim for vicarious liability against the City.  Generally, when a public official is entitled to official immunity for their conduct, the official's employer will enjoy vicarious official immunity from a suit stemming from that conduct.  Welters, 968 N.W.2d at 587.  If a public official is not entitled to official immunity, the official's employer is not entitled to vicarious official immunity.  Id.

As discussed above, the Officers are entitled to official immunity for all conduct except the detention of the Children in the squad cars and at MPD headquarters.  As a result, the City is entitled to vicarious official immunity from all state law claims except the portions of the false

imprisonment, intentional infliction of emotional distress, and negligence claims that are based

on the Officers' detention of the Children.  Count IX is dismissed in part.

## IV.  CONCLUSION

Based upon all the files, records, and proceedings herein, **IT IS HEREBY ORDERED**

that:

1.    Defendants City of Minneapolis, John Delmonico, Richard Jackson, Troy Carlson, Donnell Crayton, Ryan Davis, Matthew Gottsch, Benjamin Hain, Daniel Ledman, Rachael Lynch, Peng Moua, Danielle Phernetton, Kyle Pond, Andrew Reed, Travis Williams, Jason Wolff, Aaron Womble, and Toua Yang's Motion for Partial Judgment on the Pleadings [Docket No. 37] is **GRANTED IN PART and DENIED IN PART**;

2.    Counts I, II, V, VII, VIII, X, and XIII are **DISMISSED**;

3    Count III is **PARTIALLY DISMISSED** as to Chamee Vue and Benjamin Vue's claim for excessive force, but survives in all other respects;

4.    Count XII is **PARTIALLY DISMISSED** as follows:

   a.    The claims against Defendants Troy Carlson and Rachael Lynch are dismissed;

   b.    The claims by Mai Pha Vue and Mai Yang Yang are dismissed; and

   c.    The claims by Chamee, Hailee, Nou, and Benjamin Vue's are dismissed as to all conduct except the detention of the Children in the patrol vehicles and at MPD headquarters as described in ¶ 299(d),(h),(i), and (j) of the Complaint.

5.    Count XIV is **PARTIALLY DISMISSED** as follows:

   a.    The claims by Mai Pha Vue and Mai Yang Yang are dismissed; and

   b.    The claims by Chamee, Hailee, Nou, and Benjamin Vue's  are dismissed as to conduct unrelated to the detention of the Children in the patrol vehicles and at MPD headquarters.

BY THE COURT:

Dated:  June 15, 2022

<u>s/Ann D. Montgomery</u>
ANN D. MONTGOMERY
U.S. DISTRICT COURT